Filed 7/28/14  P. v. Mitchell CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JAMES RAPHAEL WHITTY MITCHELL,<br><br>        Defendant and Appellant. | A133094<br><br>(Marin County Super. Ct.<br>No. SC165475A) |

Defendant James Raphael Whitty Mitchell was convicted in a jury trial of first degree murder (Pen. Code, § 187), corporal injury on a cohabitant (§ 273.5),[1] kidnapping (§ 207), child abduction (§ 278), child endangerment (§ 273a), and stalking (§ 646.9). The jury found defendant personally used a deadly weapon in counts one and two (§ 12022, subd. (b)(1)), and personally inflicted great bodily injury with respect to count two (§ 12022.7).  Additionally, there was an allegation that the homicide occurred with the special circumstance of kidnapping (§ 190.2, subd. (a)(17)(B)), which the jury found to be not true.  Defendant was sentenced to imprisonment for 35 years to life.

The following issues are raised on appeal:  (1) whether the trial court erred by refusing to allow defendant to discharge his retained attorneys on the eve of trial or permit them to withdraw; (2) whether defendant's retained attorneys provided ineffective assistance of counsel before trial or at sentencing; (3) whether the trial court erred by denying defendant's motion to appoint new counsel for purposes of a new trial motion

---

[1] Undesignated statutory references are to the Penal Code.

1

and sentencing; (4) whether the trial court erred by refusing to order a competency hearing under section 1368; (5) whether the trial court properly handled defendant's request for funds to retain a psychiatric expert; (6) whether the evidence was sufficient to sustain the conviction for child endangerment; and (7) whether the restraining order issued to protect members of D.K.'s family was authorized under section 646.9.

We conclude that defendant was not deprived of his Sixth Amendment right to counsel of his choice by any of the court's rulings; defendant's claims of an irreconcilable conflict amounted to a difference of opinion about defense strategies, which was a matter exclusively within counsel's control. The denial of all of the motions was within the trial court's discretion due to the lateness of the requests and the disruption of the proceedings that was sure to ensue. We also find no evidence of ineffective assistance of counsel before trial or at sentencing and, in any event, could not find any prejudice from counsel's handling of this difficult case. The trial court acted within its discretion in refusing to suspend criminal proceedings under section 1368 and responded reasonably to counsel's request for funds for a psychiatric expert. There was more than sufficient evidence of child endangerment. Based on recent authority, however, the restraining order was not properly issued in favor of D.K.'s mother and child. We, therefore, reverse the restraining order, but otherwise affirm the judgment.

## FACTUAL BACKGROUND

### The Crimes

Defendant testified at trial, and much of the following background comes from his testimony. Defendant and D.K. met at a San Francisco club in August 2007. They moved in together about two weeks later. They had a child together (the minor).

Defendant admitted at trial that he and D.K. got into fights when one or both was drinking or taking drugs, with defendant's preferred drugs being marijuana and methamphetamine. Although he used methamphetamine a lot when he was younger, he claimed he had used it only two or three times since 2007.

Defendant admitted he committed several acts of domestic violence against D.K. before the crimes alleged in this case. First, in 2008, when D.K. was pregnant, defendant

2

slapped her during an argument in her apartment in San Francisco because she would not give him the car keys. Defendant was arrested, pled guilty to a domestic violence charge, and was placed on probation. Second, as they argued in the car while moving possessions from his place to hers, defendant backhanded D.K. Third, when defendant wanted to leave the apartment during an argument, he pushed D.K. out of the way. D.K.'s friend Erica was present on that occasion. Fourth, defendant took D.K. and her sister out to dinner in San Francisco. As he was driving them home afterwards, he and D.K. had a fight about trying to find drugs for the evening. Defendant slapped D.K. Finally, he hit D.K. in the face and gave her a bloody nose while she was on the phone with his cousin, starting to tell him that defendant was using drugs. She was holding the minor when he hit her.

Defendant and D.K. reunited after the incidents of violence, sometimes at the initiative of D.K., despite stay-away orders. In March 2009, however, defendant was arrested for a probation violation based on D.K.'s allegation that he had violated the San Francisco restraining order. D.K.'s testimony from that proceeding was read into the record. She claimed defendant owned a gun in November 2007 and had pointed it at her before, and now he told her he could easily get a gun within two hours. Defendant was arrested, but released after spending three or four days in jail, and his probation was modified.

After that probation violation, defendant went to Canada and stayed there in May and June. During that time, he spoke with D.K. on the phone at least once a day.

In June 2009, after he returned from Canada, defendant began taking methamphetamine again. D.K. caught him taking methamphetamine and packed her bags and left. D.K. and the minor moved in with D.K.'s mother in Novato.

On June 26, 2009, defendant went to D.K.'s apartment (he testified it was at her invitation) to see her and the minor. When he arrived, D.K. and her mother did not seem to want him there. Her mother called 911. Defendant was confused, but left when asked. After a police officer responded, a call came in to D.K.'s phone from defendant. The

3

officer took the call and asked defendant to turn himself in. Defendant said he would "rather go home in a body bag" and threatened to kill the officer.

D.K. had also obtained a temporary restraining order against defendant from the Family Court in Marin County, in late March 2009. The temporary order was scheduled to be made permanent at a hearing on July 7, 2009. Neither defendant nor his attorney appeared for the hearing, and a copy of the order was mailed to him on July 10, 2009. Defendant denied having received that order.

Phone records showed the many phone calls defendant had made to D.K.'s phone in the weeks preceding her death, including 92 calls between June 16, 2009 and June 25, 2009, and 40 calls on June 26 alone. He twice called D.K.'s best friend, Erica, once on July 5 (when he left a message asking her to intercede on his behalf with D.K.) and again on July 11 (the day before the murder), when she accepted his call directly. He admitted he had "fucked up," but would do anything necessary to get back together with D.K. and the minor. Defendant said he missed the minor, but was not going to "do anything stupid or crazy." He said, "I don't know what to do anymore," and if D.K. just told him she was in love with someone else, "that'd be like a lot easier than just messin' around with my emotions all the time." Defendant called D.K. 78 times between June 26 and July 12, 2009, but D.K. never answered until July 12.

Vasiliki (Bessie) and Nicholas Tzafopoulos (Nick), who was 80 at the time of trial, lived in the downstairs unit of a duplex in Novato, while D.K. and the minor lived with D.K.'s mother in the upstairs unit. Shortly before 7:00 p.m. on July 12, 2009, Bessie heard a scream and thought D.K. may have fallen down the stairs with her child. Bessie looked out of her living room window, but did not see anything.

About the same time, Nick heard a thumping sound and went outside to investigate. In the side yard, from a distance of about 15 feet, he saw a man repeatedly hitting D.K. on the head with a baseball bat. Afraid for his personal safety, Nick stepped back into the apartment and told Bessie to call the police "because he's here." Bessie called 911 and told the dispatcher it was the child's father who was beating D.K. Nick

4

continued to hear the thumping noise as he stood in the house. Nick was screaming at the top of his lungs and said the man was using a bat.

Bessie then saw a white man run past the window with a screaming child under his left arm. The man had a shaved head and wore a black T-shirt and jeans. Nick also saw a man wearing dark clothes run away with a child, down the dead-end court into a car. Two other neighbors also saw a man running away carrying a screaming child. The witnesses who were able to describe the man said he was white, bald or having a shaved head, about six feet tall, and "built up" or "heavyset," which matched defendant's description.

The descriptions of the clothing worn by the man were not consistent, however, and there were weaknesses in the identification. One neighbor thought the man carrying the child was wearing a big, white T-shirt. Nick picked the wrong man at a live lineup. The neighbor who said the assailant was wearing a white T-shirt could not identify anyone in a photo lineup that night, but he did identify defendant with "95 percent" certainty at a live lineup a week later. The neighbors testified to seeing only one man involved in the altercation and kidnapping. Nick testified the man he saw hitting D.K. was the same man who ran off with the child.

When police arrived they found D.K. on the side of the residence, lying on her side with multiple fractures to the back of her head and a large amount of blood pooling around her head. The officer checked for a pulse and breathing, but found nothing. D.K. died on the spot from blunt force trauma. D.K.'s keys were found in her left hand. A black baseball bat lay about two feet from her leg. Later examination would show the bat had defendant's left index fingerprint on it near the grip. Defendant is left handed.

John Morgan (Morgan), a close cousin of defendant, testified that he got a message from D.K.'s mother that evening saying defendant had killed D.K. and taken the minor. Morgan called defendant and could hear the minor in the background screaming. Morgan asked defendant if he knew D.K. was dead, and defendant said he did. Both men were crying. Morgan tried to get defendant to take the minor someplace safe. Defendant said he was going to Mexico, and authorities "would have to pry [the minor] out of his

5

dead, dying arms." Defendant did not deny or admit killing D.K. Morgan testified on cross-examination that he had never seen defendant with a baseball bat and had never seen a baseball bat at defendant's house, even though he sometimes stayed in a room there and had helped defendant move several times. He did not recognize the bat that killed D.K.

Defendant's brother, Justin Mitchell (Justin), also received word that D.K. was dead that evening and called defendant's cell phone. It sounded like defendant was driving, and Justin heard the minor in the background. Defendant was teary and distraught. He said he was taking the minor to Mexico. Defendant talked about how much he loved the minor and said he wanted to see her grow up and did not want to be apart from her. Defendant also mentioned he might take the minor to his own mother. Defendant then said he had to go and hung up. He neither admitted nor denied killing D.K. Justin, too, had never seen defendant with a baseball bat and had not known him to play baseball or softball as an adult.

Novato police called AT&T to track defendant's cell phone and found he was heading east on Interstate 80. They tracked him as far as Auburn, east of Sacramento. The car stopped in a residential location in Citrus Heights. Citrus Heights Police were notified, and a perimeter was set up. When officers approached the car they found the minor alone, sleeping in the front seat. The minor was unharmed, but she had a dried red substance on her cheek and shoe that proved to be D.K.'s blood.

Defendant's passport was found in the center console of the car, and a temporary restraining order dated March 20, 2009 was found in the trunk. Defendant was located walking on a street several blocks from the car. He did not resist arrest. He was wearing a red and navy blue striped shirt and jeans.

Aside from the above testimony, there was physical evidence that the front of defendant's jeans had D.K.'s blood spatter on them, and the pattern was consistent with the victim having received blows to the head with the bat while she was on the ground. The fine blood spatter suggested defendant was only a few feet from the source of the blood, probably less than five feet away when D.K. was being bludgeoned with the bat.

6

The blood was all on the front of his pants; no blood spatter appeared on the back of them or on the shirt defendant was wearing when he was arrested.

The prosecution had the bat tested for trace DNA (i.e., not from blood). The primary contributor was D.K., but defendant could not be excluded as a low-level trace DNA contributor, nor could the minor. If defendant was a low-level contributor, then there was another low-level contributor of trace DNA on the bat, since the DNA sample included an allele foreign to both D.K. and defendant.

Phone records showed that defendant called D.K. 19 times on July 12, but made no calls to her after 6:42 p.m.

*The Defense*

Defendant testified on his own behalf, raising a defense of mistaken identity. He claimed he did not kill D.K., but tried to raise a suspicion that two other unidentified men may have. He testified that on July 12, 2009, D.K. invited him over to her house. He left his home in Pittsburg sometime after 5:00 p.m. and drove to D.K.'s apartment. He was wearing a red and blue striped polo shirt and jeans. Defendant parked at the base of the court and walked toward the duplex.

As he walked through the front gate, he heard D.K. yell, "help." He jogged around the corner of the duplex and immediately became "engaged" with a man in a white shirt. The man had a "buzzed head" and "very light sky blue" eyes and bad breath. The two began pushing each other. As the two fought, out of the corner of his eye defendant saw a man in a black T-shirt running past him. As he struggled with the man in the white shirt, he was hit in the back with a baseball bat. He turned around and saw the guy in the black T-shirt and struggled with him. The man was a little taller than defendant, well built, with hairy arms and gray or brown eyes. Defendant tried to take the bat away from the man, and then re-engaged with the man in the white shirt. The man in the white shirt then knocked defendant down. He immediately hopped back up and then ran down the cul-de-sac because he heard the minor screaming.

Defendant chased the man in the black T-shirt, who had the minor. Defendant caught up to the man and faced him. He told the man to give him the minor, and then

7

batted him on the cheek and kicked him in the shin. The man let defendant grab the minor and then ran away.

As defendant started to head back to D.K.'s apartment, he heard someone say, "call 9-1-1." Defendant then remembered he had a restraining order and decided to leave before the police arrived.

Defendant drove north on Highway 101. He called his cousins. He planned to go to his cousin's house to wait for D.K. to call him. He did not call D.K. because he did not want to call her while the police were there. Then his mother called and told him D.K. was dead, and D.K.'s mother was saying that defendant had killed her. Defendant told his mother he could not talk any longer because he had to talk to his lawyer right away.

By chance, he ran into his attorney, Terrence Hallinan, at a gas station in Auburn that night. He had run out of gas, and he left the minor in the car in order to separate himself from her because he was afraid of what the police might do if they caught up to his car.

Defendant testified he did not see anyone hit D.K. with a baseball bat, did not know she was dead when he left with the minor, and did not even see D.K. at all that day. He could not explain how the blood spatter got on his jeans.

The defense presented testimony of the head coach of women's softball at San Francisco State College that the softball bat used in the assault was the kind that would be used by a high school or small college man or woman. D.K.'s mother, called by the defense, denied having seen the bat around her home. She testified that her other children played baseball or softball as children, but D.K. did not. She claimed the children's bats had been given away to Goodwill. D.K.'s mother was impeached by the county coroner, who testified that on the day after the murder, she told him the bat may have been in the laundry room of her apartment prior to the murder.

The defense also presented testimony that a urine test done after defendant's arrest showed he had no alcohol in his system and a small amount of methamphetamine tending

8

to indicate defendant had used methamphetamine within the past five days, or if he was a chronic user, it may have been detectable for up to seven days.

### Defense Counsel's Closing Argument

In closing argument to the jury, Stuart Hanlon, who represented defendant at trial, first suggested it was not unbelievable that D.K. had invited defendant over to her house since she had previously initiated contact with him despite restraining orders. This, he argued, was also consistent with the testimony of a domestic violence expert who acknowledged couples have trouble separating, even in abusive relationships. Having adduced evidence tending to show the baseball bat belonged to D.K., not defendant, Hanlon argued that defendant did not bring the bat with him and, thus, there was insufficient evidence of premeditation and deliberation. He also noted that defendant did not bring with him the things he would have wanted if he had been planning to kidnap the minor, such as diapers and bottles. Using this evidence, he argued against a first degree murder conviction based on either premeditation and deliberation or felony murder, as well as arguing against the kidnapping special circumstance.

Hanlon then argued the believability of defendant's testimony as best he could. He pointed out weaknesses in the witness identifications, and reminded the jury that other witnesses had testified about both a man in a black T-shirt and a man in a white T-shirt, which was consistent with defendant's testimony about the two other men with whom he claimed he had a confrontation. Defendant, on the other hand, wore a blue and red striped shirt, and the prosecution never presented evidence that he changed his shirt after the crime.

Hanlon admitted defendant must have been near D.K. when she was beaten to death because of the blood spatter on his jeans. But he argued that defendant must have been "locked in" on the man in the white shirt, with whom he was fighting, so that he did not notice D.K. being murdered. He argued that defendant's fingerprint could have got on the bat when he struggled with the man in the black T-shirt over the bat.

Finally, near the end of his argument, Hanlon explained—if the jury did not believe defendant's version of the events—still, the crime most likely occurred in an

9

"explosion of anger," and in the "heat of passion." He pointed out the coincidence of the date with defendant's father's death, which tended to suggest that some kind of psychological factors may have been at work. He argued that defendant's phone calls to D.K. had not been threatening, but rather sad and "pathetic" pleas to get back together with her. And he recited that Erica testified defendant did not sound angry and she believed he was sincere in wanting to change his ways when she talked to him on July 11. None of this pointed to a premeditated murder. Hanlon theorized that D.K. must have said something, such as telling defendant he could not see the minor, that made him snap, and the killing occurred in a fit of rage.

## PROCEDURAL HISTORY

### *Continuances to Change Counsel*

We now turn to the lengthy procedural history in this case. On December 4, 2009, the information was filed, and defendant appeared for arraignment with attorney Hallinan. The court tentatively set jury selection for May 27, 2010. On February 24, 2010, the parties appeared and Hallinan informed the court that he had been fired by defendant.

On March 11, 2010, Hallinan appeared along with Douglas Horngrad, who announced his intention to substitute in as defendant's retained attorney. Horngrad said he had just been retained that week, and he would need a 60-day continuance because it was a "huge case." The trial court expressed concern about a substantial continuance.

The prosecution indicated it had no objection to a continuance for trial until September of 2010. The prosecutor stressed the People's right to a speedy trial, and pointed out that two of the witnesses were very elderly. The court allowed a substitution on Horngrad's assurance he could begin the trial on October 21, 2010.

On August 8, 2010, Horngrad requested another continuance of about four months based on problems with the processing of the DNA evidence. The court continued the trial to January 20, 2011 for jury selection.

On September 1, 2010, Horngrad appeared and moved to withdraw as counsel, telling the court that Hanlon and his associate, Sara Rief, would be substituting in. At a

10

closed hearing, counsel explained that he and defendant had a disagreement about defense strategy, and "it was communicated to me both directly and indirectly that there are concerns regarding my physical safety that should compel me to adhere to [defendant's] strategies . . . rather than the strategies that I believe were legally sound."

The court expressed concern whether such problems might occur with "any defense attorney," making clear it did not want to have the next counsel come in and say there was a similar problem. Horngrad assured the court that Hanlon "is a terrific attorney" and "an extremely gifted lawyer . . . whose word is his bond." Horngrad said he had been very clear with Hanlon that the trial dates could not be moved, and Hanlon had agreed to them.

The judge reconvened in open court where Rief stated they "were ready and available for the dates that this Court has previously set." The court said it would allow defendant to change counsel, but only if new counsel were prepared to "take on the trial date." The judge stressed that the trial date had already been continued from October to January, and the court was "not inclined to start shifting lawyers again just to continue the trial date." Horngrad said his trial preparation in the case was very complete and he would give his files to Hanlon.

On December 16, 2010, both sides agreed to a two-week continuance because of issues with transportation of the bat to a defense laboratory. The trial was reset for February 3, 2011.

On January 20, 2011, defense counsel raised more issues with regard to DNA testing and sought a continuance of trial to mid-March. The court affirmed its belief that both sides were working diligently, but stressed that the case was nearing two years old and "I can't just ignore that." The court continued the trial date to June 17. Jurors would be summoned on May 9, juror questionnaires would be provided, and hardship requests would be discussed. A jury would be selected beginning June 14. Opening statements were to commence on June 17, with presentation of evidence to begin on June 21.

11

***Defendant's Request to Remove Retained Attorneys and Substitute the Public Defender***

On May 10, 2011, at the commencement of jury selection, defendant moved to relieve his attorneys and to have the case turned over to the public defender due to his indigence. He complained that "trust issues" had arisen between him, Hanlon and Rief. He said his defense attorneys were just telling him what he wanted to hear, but were not being forthright with him. Defendant informed the court he was going to sue his attorneys and asked, "So, why am I going to . . . sit with counsel who I'm possibly going to sue?" Defendant did not question counsel's competence—especially after the court told him there were "no more competent lawyers than the ones you've had," and that "the reputation of . . . the lawyers you have now is just extraordinary." But he did question their honesty.

The court denied the motion due to the imminence of trial, the fact that jurors had already appeared for hardship excusals, witnesses had been subpoenaed, and granting the motion would cause an inevitable delay in and disruption of the trial. It then proceeded to convene groups of jurors and required them to fill out juror questionnaires. Over the course of the next month, the court and counsel adjudicated the numerous hardship and cause challenges.

***Defense Counsel's Request for Funds for a Psychiatric Examination***

At an ex parte hearing on May 25, 2011, which defendant did not attend, Hanlon requested $20,000 to $30,000 from the court for a forensic psychiatric examination of defendant. Hanlon told the court there was much evidence that defendant possibly had psychological problems. Hanlon confirmed defendant would testify he did not commit the murder, and said there was some evidence supporting that theory. But, he added, "[w]hether I argue that or not will be up to me." Hanlon suggested that, based on interviews with family members, defendant had "a history of . . . mental issues." And despite defendant's strong wishes to the contrary, "I have an obligation to explore as best I can all avenues of defense." We shall discuss the record of this colloquy in more detail in section V, below.

12

***Defendant's Request to Represent Himself***

On Friday, June 10, 2011, in open court while discussing juror issues, defendant said he wanted to represent himself, and there would be no disturbances or delays. Defendant explained: "It's really a personal problem, and I don't trust him. I don't like him. I don't want anything to do with them. They've been way too disruptive. Like if they're going to lie to me, I can only imagine that they're going to lie to a jury. This man wants to do that to a jury, I can only imagine the blowback and the effect that it's going to have on me as a defendant in this case. And like I said if we want to discuss it further, we could discuss it under seal. But other than that, it's my right. [¶] I've done the research. I can go [pro. per.] any time I wish or any time that I see. I have to say I'm very competent in the case. I know the information. The only thing I'd ask the Court to do is order present counsel I do have right now to turn over all documents, all—like all investigations, like, you know, all experts, like everything, all the trial books, everything that they have done thus far and then turn it over to me here in the jail. And our next court date is June 14th, right? [¶] . . . [¶] We're dark on Mondays. I'll be ready to go on Tuesday. If they turn everything over to me today or Saturday, I'll be ready to go on Tuesday." Defendant assured the court he was ready to proceed on the pending motions "right now." The court stated, "Well, it sounds as though you know what you're doing and that you want to make this decision."

In response to an inquiry from the court, Hanlon said: "My understanding of the law is Mr. Mitchell, if he's prepared to go on Tuesday, he has an absolute right to represent himself. For what it's worth, he's intelligent. He understands the facts of the case, which I've discussed at length with him. He understands the issues. He's been able to communicate with me about these matters. [¶] On that basis—I'm not commenting on what he said or why he wants to do this, but if I had any doubts about his competency, I would say. In terms of being able to understand the issues and the law, my discussion with him for the last period of time however long it's been since I've been his lawyer, he does have that ability, and he understands. He certainly understands the issues in the

13

case, discussed the legal concepts with me at length. That—that's my only real comment."

The court continued the trial until Monday, and ordered Hanlon to produce the entire file to defendant over the weekend. The court concluded by assuring defendant that he had the right to represent himself.

On Monday, June 13, 2011, defendant acknowledged receipt of the files and still wanted to represent himself. Defendant then produced a list of requests to the court, including the need to procure counsel's "case law studies . . . from Westlaw," to confer with Hanlon's investigator, to have the court order the jail to allow him out of his cell for four or five hours a day, to receive a copy of the Evidence Code, and finally, he said he needed time to interview witnesses. Defendant said under current conditions, with only one to two hours a day out of his cell, he could be ready to proceed to trial "in four weeks, and this is like after we do voir dire . . . ." He indicated that if he could get out of the cell more, for four or five hours a day, he could be ready by June 28. The prosecution objected to the continuance.

The court reminded defendant he had earlier stated he would be able to go to trial without a continuance. In light of defendant's need for another continuance, the court noted its decision was "discretionary." It made a detailed ruling denying defendant's request, including that jury selection had already been underway for a month, in limine motions had been adjudicated, prior continuances had been granted to accommodate defendant's changes of counsel, and "most importantly," defendant would need "at least four weeks" to get ready to go to trial.

### Retained Counsel's Request to Withdraw

Immediately after that ruling, Hanlon moved to withdraw as counsel. The court convened a closed hearing with Hanlon, Rief and defendant. Hanlon told the court defendant had threatened him and Rief, and they had concerns for their safety. Hanlon said he was afraid to sit at the counsel table with defendant because he might "get a pencil in [his] face." He also said he could no longer communicate with defendant and could not act competently as counsel because he no longer felt a sufficient commitment

14

to his client. He said he had two letters he considered threatening, but he would not show them to the court based on attorney-client privilege.

The court noted this was a "discretionary" ruling and was "similar analysis" to the "[pro. per.] request." The judge looked at whether the withdrawal would "work an injustice in the handling of the case" or would "cause a delay," concluding that if counsel were to be relieved "it would cause a horrible injustice in the handling of the case" and would "require an undue delay." The judge complimented Hanlon and Rief, saying they were "two of the most competent lawyers" to appear in her court, were always "thorough, . . . competent, . . . [and] ready to go," and had provided defendant with "excellent representation" so far.

Defendant denied any such threats were "imminent" or "dangerous." He said his letters to counsel were a product of his frustration and anger with being locked up "23 hours a day." He said he "like[d]" Hanlon and Rief and would not harm "people who he care[d] about."

Based on the timing and other factors it considered in denying the pro. per. request, the court also denied counsel's request to withdraw.

### Counsel Expresses a Doubt as to Defendant's Competency

When the matter was reconvened in open court, Hanlon expressed doubt as to defendant's competence. The court declined to suspend criminal proceedings to hold a section 1368 hearing based in part on the court's own discussions with defendant in the course of his *Faretta* motion and Hanlon's motion to withdraw, in part on Hanlon's contradictory statements about defendant's competency to represent himself, and based on the fact that Hanlon had represented defendant for nine months without expressing a doubt about his competency. The court noted that the expression of doubt came on the heels of the denial of Hanlon's motion to withdraw, and the "timing is suspicious." The next day Hanlon filed a declaration supplementing the factual basis for his doubt about defendant's competency, but the court again declined to initiate a competency hearing.

Opening statements were made on June 21, 2011. Evidence was taken from June 21 through July 6. The jury began deliberating on July 8 and returned its verdicts on the next court date, July 12.

***Posttrial Proceedings***

The court scheduled the sentencing hearing for August 16, 2011, taking into account Hanlon's scheduling conflicts that would prevent his availability from early September to October. On August 8, Hanlon filed "Defendant's Request to Relieve Present Counsel and Request for Appointment of New Counsel for Purposes of Sentencing and Motion for New Trial." In the motion, Hanlon stated that defendant wished to have new counsel appointed to pursue a new trial motion based on Hanlon's purported ineffective assistance at trial. Hanlon expressed his disagreement that he had rendered ineffective assistance. Hanlon also requested to withdraw for purposes of sentencing because of defendant's "lack of faith." The prosecution filed a written opposition.

At the commencement of the August 16 hearing, the trial court brought up the motion, and the parties agreed that a hearing out of the presence of the prosecutor was appropriate. At that hearing, the trial court asked defendant to explain why he believed Hanlon had been ineffective at trial. The reasons included most prominently Hanlon's raising a heat of passion defense in closing argument, which defendant believed was inconsistent with his testimony.

After hearing defendant's complaints, the trial court denied the motions, finding no evidence of ineffective assistance by Hanlon. In fact, the court believed Hanlon's representation had been "excellent," and his handling of the inconsistent defenses was "sort of a brilliant argument."

Sentencing went forward on August 16, with defendant receiving a 35 to life prison sentence, consisting of a 25 to life sentence for the murder of D.K. with one consecutive year for the deadly weapon enhancement, the aggravated term of eight consecutive years for kidnapping, and one consecutive year for stalking. Sentences for the remaining crimes and enhancements were imposed, but stayed under section 654.

16

## DISCUSSION

### I. Issues Relating to Legal Representation at Trial

#### A. *Motion to Discharge Retained Attorneys and Substitute in the Public Defender*

When defendant made his first motion to discharge Hanlon and Rief and substitute in the public defender, jury selection was about to begin. Defendant explained his "trust issues" with counsel as follows: "I have letters written from them, like, you know, from their office saying like we're going to help you with this, and we're going to do whatever. And then I learn[ed] like two weeks before jury hardships that's not the case, that it's completely like, you know, it's like, you know, they're not going to do it whatsoever." Defendant said he wished he had learned "this" four months ago, instead of "now." Defendant concluded it "kind of raises an alarm in me—it alarms me what else are they not telling me and what else are they misleading me on."

In denying the substitution, the judge said, "Of course, I have to consider the defendant's request, which is that he have counsel of his choosing." Nevertheless, she noted that Hanlon and Rief were defendant's third set of attorneys, and they were "very competent, experienced, excellent lawyers." The court reminded defendant that the trial had been continued several times at his request, mostly to get new counsel ready. Further, the court again remarked that the case was two years old, motions in limine had been completed, the current date was the day set to hear juror hardships, and the court was only informed of defendant's request the previous day.

"We have 65 witnesses approximately under subpoena, 800 jurors have been summoned, a hundred of them for today, and they're upstairs. And I think that any further delay would result in a complete disruption of an orderly and just process. There's not another counsel here ready to go. The only way that Mr. Mitchell could have what he wants was if I discharged counsel, reset the case again, re-subpoenaed witnesses, re-summoned jurors, and then gave counsel additional time to prepare. And then if there's a discontent between that attorney and this defendant, I'm not sure where we would be. Seems that perhaps that's a common thread. In any event, it's the 11th hour.

We've already proceeded with in limines, jurors are upstairs. I'm denying the request on balance pursuant to" *People v. Keshishian* (2008) 162 Cal.App.4th 425 (*Keshishian*).

Both an indigent and a nonindigent criminal defendant have the right to discharge a retained attorney with or without cause. "A nonindigent defendant's right to discharge his retained counsel, however, is not absolute. The trial court, in its discretion, may deny such a motion if discharge will result in 'significant prejudice' to the defendant [citation], or if it is not timely, i.e., if it will result in 'disruption of the orderly processes of justice' [citations]. . . . [T]he 'fair opportunity' to secure counsel of choice provided by the Sixth Amendment 'is necessarily [limited by] . . . the interest in proceeding with prosecutions on an orderly and expeditious basis, taking into account the practical difficulties of "assembling the witnesses, lawyers, and jurors at the same place at the same time." ' The trial court, however, must exercise its discretion reasonably: 'a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality.' [Citation.]" (*People v. Ortiz* (1990) 51 Cal.3d 975, 983–984 (*Ortiz*).)

In the case of an untimely motion to discharge retained counsel, we apply the abuse of discretion standard on appeal. (See, e.g., *People v. Lara* (2001) 86 Cal.App.4th 139, 153–155, 165–166.) "A trial court's exercise of discretion will not be disturbed unless it appears that the resulting injury is sufficiently grave to manifest a miscarriage of justice. [Citation.] In other words, discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered." (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65.)

There is no question in the present case that denial of the May 10, 2011 motion was justified. In balancing defendant's request against the disruption of the trial process, the trial court was expressly guided by *Keshishian, supra,* 162 Cal.App.4th 425, which held: "Because the right to discharge retained counsel is broader than the right to discharge appointed counsel, a *Marsden*-type hearing[2] at which the court determines

---

[2] *People v. Marsden* (1970) 2 Cal.3d 118.

18

whether counsel is providing adequate representation or is tangled in irreconcilable differences with the defendant is ' "[an] inappropriate vehicle in which to consider [the defendant's] complaints against his retained counsel." ' [Citations.] Instead, under the applicable test for retained counsel, the court should 'balance the defendant's interest in new counsel against the disruption, if any, flowing from the substitution.' [Citation.]" (*Keshishian, supra,* at p. 429.) Indeed it has been recognized that a motion to substitute counsel may be denied as untimely, especially when made during jury selection. (*People v. Williamson* (1985) 172 Cal.App.3d 737, 745 [motion to substitute appointed counsel]; *People v. Molina* (1977) 74 Cal.App.3d 544, 547–548 [request for continuance to retain counsel in lieu of appointed counsel]; see also *People v. Turner* (1992) 7 Cal.App.4th 913, 918–919 [denial of substitution on day of hearing on probation revocation where defendant represented by staff attorney at legal services clinic].)

More recently, in *People v. Maciel* (2013) 57 Cal.4th 482 (*Maciel*), the Supreme Court encountered a multiple-defendant death penalty case in which the defendant, whose trial had been severed, sought to discharge retained counsel approximately six weeks before the case was called for trial. (*Id*. at pp. 510–513.) The trial court denied the motion and the Supreme Court affirmed: "We conclude that the trial court acted within its discretion in denying defendant's motion to discharge counsel. At the time the motion was made, the case had been pending for two years. Trial was imminent and, in fact, began about six weeks later. Defendant had no substitute counsel in mind; rather, he requested that the court appoint counsel. New counsel would have had to study the records in each former codefendant's trial as well as in this case, resulting in significant delays. In evaluating timeliness, the trial court properly considered the long delay that would have resulted from changing counsel in this case." (*Id*. at pp. 512–513.)

Here, as in *Maciel*, the predictable disruption was great, as articulated by the trial court and quoted above. The case had already been pending for nearly two years. Jurors had been summoned and witnesses subpoenaed. Two important witnesses were elderly, the only eyewitness to the beating being 80 years old. It is undeniable that substituting in the public defender at that late date would have required a substantial delay. Denial of

19

defendant's motion was directly tied to the delay and disruption that inevitably would have flowed from granting it.  The court did not abuse its discretion.  (See *People v. Turner*, *supra*, 7 Cal.App.4th at pp. 915–916, 918–919 [court's denial of belated request to discharge counsel proper because the request was unduly disruptive to "witnesses and other participants"]; *People v. Lau* (1986) 177 Cal.App.3d 473, 477–479 [denial of substitution based on disagreement between counsel and client regarding defendant's guilt or innocence, though resulting in a loss of trust on the part of the client and anger on the part of the attorney, was justified by the lateness of the request].)

Defendant attempts to distinguish *Keshishian* because in that case the client had simply "lost confidence" in his attorneys.  (*Keshishian, supra,* 162 Cal.App.4th at p. 428.)  But we find defendant's complaint of "trust" issues to be very close on its facts.  In *Keshishian*, as here, the defendant was charged with murder.  As here, the defendant appeared with retained counsel on "the day the matter was called for trial."  (*Id*. at p. 427.)  Both cases had been pending for a long time:  nearly two years in our case and two and a half years in *Keshishian*.  (*Id*. at p. 428.)  Previous continuances had been granted in both cases at the defense's request.  (*Ibid*.)  The Court of Appeal noted in *Keshishian* that "[a]n indefinite continuance would have been necessary, as [defendant] had neither identified nor retained new counsel."  (*Id*. at p. 429.)  True here also.  And in both cases the courts held retained defense counsel in high regard, and both counsel appeared ready for trial.  (Compare *Keshishian, supra,* at p. 428 ["some of the best attorneys in all of Southern California"] with our case ["two of the most competent lawyers" to appear in her court].)  "Witnesses whose appearances had already been scheduled would have been further inconvenienced by an indefinite delay."  (*Id*. at p. 429.)  So, too, here.

On these very similar facts *Keshishian* held:  " ' "The right to counsel cannot mean that a defendant may continually delay his day of judgment by discharging prior counsel," ' and the court is within its discretion to deny a last-minute motion for continuance to secure new counsel."  (*Keshishian, supra,* 162 Cal.App.4th at p. 429.)

20

Under *Maciel* and *Keshishian*, we find there was no abuse of discretion in denying the substitution motion.

Defendant insists, however, he had an actual conflict of interest with Hanlon because he had a potential lawsuit against him, which he claims *required* the court to allow him to replace Hanlon with new counsel, citing *U.S. v. Moore* (9th Cir. 1998) 159 F.3d 1154, 1158–1160 (*Moore*). *Moore* involved a federal prosecution for conspiracy to distribute cocaine and possession for distribution. (*Id*. at p. 1155.) Moore wanted to put on a defense of withdrawal from the conspiracy, but his counsel disagreed. (*Id*. at p. 1156.) However, *Moore* differed from our case in that Moore's attorney failed to communicate to Moore a plea bargain offer until it was too late to respond. (*Id*. at p. 1158.) Moore, in response, threatened to sue him and reacted so badly that his attorney felt physically threatened. (*Id*. at p. 1159.) Moore's counsel moved to withdraw at Moore's request. (*Ibid*.) The Ninth Circuit concluded that defendant and his attorney had "no actual conflict because Moore's threat to sue [his attorney] for ineffective assistance was not inconsistent with [the attorney's] goal of rendering effective assistance." (*Id*. at p. 1158.)

Thus, *Moore* is not favorable to defendant's position on conflict of interest: "Although a lawsuit between defendant and counsel can potentially create an actual conflict of interest, we do not find that Moore's threat actually resulted in a conflict in this case. . . . Moore's threat of a malpractice suit never went beyond the threat to file a claim against [his attorney]. Despite Moore's assurances that he had a valid claim for malpractice, finding an actual conflict from a mere threat would allow defendants to manufacture a conflict in any case. We decline to adopt such an unbounded rule. While Moore's threat is evidence of the breakdown of the attorney-client relationship, we agree with the district court that it was insufficient to create an actual conflict of interest." (*Moore, supra,* 159 F.3d at p. 1158.)

The *Moore* court went on to find an irreconcilable breakdown between Moore and counsel, noting it is only "if the relationship between lawyer and client completely collapses" that the courts must be concerned about violation of the Sixth Amendment

21

right to counsel.  Having found a complete breakdown in the relationship, the court did not require a showing of prejudice.  "A defendant need not show prejudice when the breakdown of a relationship between attorney and client from irreconcilable differences results in the *complete denial* of counsel."  (*Moore, supra,* 159 F.3d at p. 1158, italics added.)  The factors considered by the court in assessing whether there was an irreconcilable conflict were:  "(1) the extent of the conflict; (2) the adequacy of the inquiry; and (3) the timeliness of the motion."  (*Id.* at pp. 1158–1159.)

The extent of the conflict was more serious in *Moore*, where the court found the defendant had valid grievances against counsel, including failure to timely inform him of plea negotiations and failure to prepare for trial.  (*Moore*, *supra*, 159 F.3d at p. 1159.)  Here, by contrast, we see no likelihood that the difficulties in the relationship resulted from Hanlon's negligence or lack of preparation.  The underlying dispute was essentially one of tactics.  Defense counsel were not refusing to put on a defense that defendant wanted to assert, but rather were considering putting on an additional and alternative "defense" of mitigated culpability.  There was never any claim that Hanlon was unprepared for trial or had blown his client's chance to get a favorable plea bargain.

Moore's attempts to substitute counsel were also more timely than defendant's.  Moore brought the problems to the court's attention four times before trial, nearly a month before the trial was scheduled to begin and six weeks before it actually began.  He raised the issue at the first opportunity following his explosive meeting with counsel in which he learned that the plea bargain was no longer available.  (*Moore*, *supra*, 159 F.3d at pp. 1158–1159.)  Even Moore's final attempt to obtain substitute counsel was made two weeks before trial and was deemed timely.  (*Id*. at p. 1161.)  We also note that Moore's case had been pending for a far shorter time than the present case, there was no mention in *Moore* of any previous attempts by the defendant to change counsel (and the timing of events suggests there had been none), and the opinion does not disclose whether as lengthy a trial was required.

Moore was also backed up by his counsel throughout the substitution motions in affirming there had been a breakdown (*Moore*, *supra*, 159 F.3d at pp. 1156, 1158, 1161),

whereas Hanlon did not move to withdraw or bring the purported threats to the court's attention until more than a month after defendant's May 10 motion, when jury selection had been underway for more than a month. The Ninth Circuit in *Moore* found no continuance would have been necessary had the motion been granted when the attorney-client discord first was brought to its attention. (*Id.* at p. 1161.) The same is not true here.

In *Moore*, as here, the court learned more as time progressed, and by two weeks or more before trial actually commenced, the court in *Moore* was aware the attorney felt physically threatened by the defendant. (*Id.* at pp. 1159–1160.) In *Moore*, the Ninth Circuit held the district court largely to blame for the way the facts trickled in, finding the district court's initial inquiries to have been "minimal." (*Id.* at p. 1160.) We do not find the same defect in the proceedings below.

In our case, defendant mentioned primarily "trust issues" in his May 10, 2011 motion. Defendant seems to argue on appeal that there had been a complete and irreconcilable breakdown of the attorney-client relationship even as of May 10, claiming that view is supported by Hanlon's request to withdraw on June 13. But at the time of defendant's May 10 motion, defense counsel did *not* represent to the judge there was any desire by the attorneys to withdraw. Rief, who appeared with defendant that day, was invited to speak, but did not voice any comment at all. She did not, as defendant seems to contend, inform the court there had been an irreconcilable breakdown in the attorney-client relationship, nor did she inform the court of any threats. (*People v. Sanchez* (1995) 12 Cal.4th 1, 37 ["In reviewing denial of motion to substitute attorneys, the court 'focuses on the ruling itself and the record on which it is made. It does not look to subsequent matters . . . .' "].)

Defendant also cites cases involving counsel with conflicting loyalties due to representation of other clients involved in some manner in the defendant's case. *Leversen v. Superior Court* (1983) 34 Cal.3d 530, 533–535, 538–540, in which defense counsel discovered at trial that his firm had formerly represented a trial witness and cosuspect in different proceedings, held counsel's motion to withdraw was improperly

23

denied. In *Uhl v. Municipal Court* (1974) 37 Cal.App.3d 526, the superior court ordered the municipal court to allow a public defender to withdraw as counsel based on an asserted conflict of interest with another of the office's clients in a different proceeding, without requiring the attorney to provide further details. Because the claim of a potential conflict was within the realm of "informed speculation," and because it would have violated the public defender's ethical duties to represent conflicting interests, the order was upheld on appeal. (*Id.* at pp. 529, 532, 535–536.) We cannot equate defendant's dispute with Hanlon over strategy with an actual conflict resulting from dual representation of clients with adverse interests. (Cf. *Glasser v. United States* (1942) 315 U.S. 60, 69–70 [attorney hired by one defendant in conspiracy trial appointed to simultaneously represent codefendant who had inconsistent interests].)

In *U.S. v. Adelzo-Gonzalez* (9th Cir. 2001) 268 F.3d 772, an irreparable breakdown had occurred where appointed counsel argued vigorously against a defendant's substitution motion, called defendant a "liar," and according to the defendant, threatened to testify against him at trial and to "sink him for 105 years." (*Id.* at pp. 778–779.) The Ninth Circuit found the extent of the conflict "prevented the attorney from providing adequate representation." (*Id.* at p. 781.) No such open antagonism was displayed in the present case. The case is both nonbinding and distinguishable.

Only in the most extreme circumstances have the courts found a breakdown in communication sufficient to establish a Sixth Amendment violation. (See, e.g., *Frazer v. U.S.* (9th Cir. 1994) 18 F.3d 778, 780 [appointed attorney called his client a " 'stupid nigger son of a bitch,' " and said he hoped defendant would " 'get life,' " and said if defendant continued " 'to insist on going to trial,' " counsel would prove to be " 'very ineffective' "]; *United States v. Williams* (9th Cir. 1979) 594 F.2d 1258, 1260 [where attorney-client relationship had for some time been "stormy," with "quarrels, bad language, threats, and counter-threats," court erred in summarily denying substitution motion made a month before trial].) In *U.S. v. Nguyen* (9th Cir. 2001) 262 F.3d 998, 1004–1005, it was primarily the district court's failure to conduct an adequate inquiry

24

that led to the reversal of the defendant's conviction on grounds that a substitution motion had been improperly denied.

Additional cases cited by defendant are not helpful to his position. *People v. Abilez* (2007) 41 Cal.4th 472, 488, involved a *Marsden* motion by a defendant charged with sodomizing and murdering his mother. He claimed his attorney (1) was "overly concerned with convincing defendant to accept a plea bargain"; (2) "discussed the case with his (counsel's) teenage son"; (3) "was disrespectful and sarcastic"; and (4) "had not discussed the defense witnesses with him." (*Id*. at pp. 485–486.) The Supreme Court found no error in the court's denial of the motion because the defendant did not claim any lack of preparation by defense counsel, and counsel explained the other accusations. (*Id*. at pp. 486–490.) Likewise, *Manfredi & Levine v. Superior Court* (1998) 66 Cal.App.4th 1128 (*Manfredi*), involved an attorney's motion to withdraw due to an ethical conflict, while he refused to divulge any details about the conflict. The Court of Appeal upheld the trial court's denial of the motion. (*Id*. at pp. 1135–1136; see also *People v. Horton* (1995) 11 Cal.4th 1068, 1105–1107 [denial of counsel's motion to withdraw upheld on appeal where client had filed malpractice action against counsel, but dismissed it during jury selection and court concluded the lawsuit had no merit].) These cases do not advance defendant's cause.

Based on the foregoing authorities, we conclude the trial court's ruling on the first motion to substitute counsel was not an abuse of discretion.

**B. *Defendant's June 10, 2011 Request to Dismiss Counsel and Represent Himself***

Next, on June 10, 2011, after the court and counsel had gone through a month of hardship challenges, defense counsel announced that defendant wished to dismiss counsel and proceed in pro. per. (*Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).) As detailed above, defendant said he did not like or trust defense counsel and insisted he would be ready to begin trial on the next court date (Tuesday, June 14). Hanlon supported defendant's motion, stressing that he had thoroughly discussed the law and facts with defendant and had no doubt as to his competence.

25

The trial court agreed that, despite the timing of the request, defendant had the near-absolute right to represent himself, absent a request for a continuance. However, when defendant returned to court the next Monday, he told the court he would need a month to prepare. The court considered the continuance request, among other factors, and denied the motion.

A *Faretta* motion may be denied if it is untimely. (*People v. Lynch* (2010) 50 Cal.4th 693, 721–722 (*Lynch*); *People v. Windham* (1977) 19 Cal.3d 121, 127–128 (*Windham*).) A *Faretta* motion brought on the "eve of trial" is untimely. (*Lynch*, *supra*, at pp. 722–723.) In assessing an untimely motion for self-representation, the trial court considers factors such as " 'the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion.' " (*Id*. at p. 722, fn. 10, quoting *Windham*, *supra*, at p. 128.)

All of those grounds argued in favor of denying the motion. Defense counsel were prepared to go to trial and were known to the court to be excellent attorneys. With regard to the length and stage of the proceedings, the trial court recited that defendant had delayed his request to go pro. per. until opening statements were about to begin, the parties had sorted out hardship and cause challenges for "approximately 1000" potential jurors, "90 percent" of the in limine motions had been ruled on "several weeks ago," the case was two years old, and several continuances had already been granted at defense request, in part to allow defendant to change lawyers. But clearly, the court's biggest concern was the four-week continuance that defendant would have needed to prepare. The court did not abuse its discretion in denying defendant's belated *Faretta* motion.

## C. *Defense Counsel's Request to Withdraw on June 13, 2011*

Immediately after the denial of defendant's *Faretta* motion, defense counsel moved to withdraw. The trial court convened a hearing out of the presence of the prosecutor to discuss the issues. After Hanlon explained his fears to the court, defendant addressed the court at some length and denied that any threats to Hanlon and Rief were

"imminent" or "dangerous," claiming he "really liked" Hanlon and Rief, and did not want to hurt them. He said, "I do get angry sometimes. But it's not to the level or to the gravity or to the effect of like me actually carrying anything out or following anything through because I would never do anything to Mr. Hanlon. I would never do anything to Mrs. Rief because I care about them." He said the letters should be seen as coming from "an upset client who is locked up in jail for 23 hours a day and has . . . no intention of . . . ever really hurting the people who he cares about."

The trial court denied Hanlon's motion. It noted that defendant's last counsel, Horngrad, "was removed for the same reason [Mr. Hanlon and Ms. Rief] are commenting upon. And it makes me wonder, . . . a defendant cannot excuse lawyers forever by issuing a threat, otherwise those people will never have a lawyer. And it happened once before. It appears to be happening again. I don't know if it's—I certainly don't know if it's something that is purposefully occurring in an attempt to have new counsel." The court applied the same factors that entered into its decision to deny the *Faretta* request.

Defendant argues that—at any stage of the proceedings—if "the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result," the defendant must be given new counsel. (*People v. Smith* (1993) 6 Cal.4th 684, 696 (*Smith*).) We do not disagree, but the trial court is not required to " 'rubber stamp' counsel's request to withdraw." (*Aceves v. Superior Court* (1996) 51 Cal.App.4th 584, 592 (*Aceves*).) Defendant insists that we must find there was an irreconcilable conflict between him and Hanlon and Rief by June 13, 2011, based on the attorneys' fear of defendant's threats. But the trial court impliedly found otherwise and we see no basis for overturning that finding. (Cf. *People v. Verdugo* (2010) 50 Cal.4th 263, 310 [threats allegedly made against counsel by defendant's father were found not to be "serious and credible" by trial court, and refusal to discharge retained counsel and appoint counsel upheld on appeal]; *In re Z.N.* (2009) 181 Cal.App.4th 282, 289, 294 [threatening phone calls from client did not require granting a belated *Marsden* motion].)

27

Defendant cites *Aceves*, *supra*, 51 Cal.App.4th 584, an opinion issued over a strong dissent.  The appellate court in *Aceves* issued a writ of mandate requiring the superior court to vacate its denial of counsel's motion to withdraw where a deputy public defender told the court, the conflict "(1) was confined to [the defendant] and the office of the public defender, (2) did not involve threats to witnesses or third parties, (3) did not relate to other cases, and (4) had resulted in a complete breakdown in the attorney-client relationship:  it was as such a classic conflict where duty of loyalty to the client is compromised by the attorney's own interests."  (*Id*. at p. 592.)  The attorney further represented as an officer of the court he could say no more about the conflict "without violating the [attorney-client] privilege or breaching ethical duties," and the trial court did not doubt the attorney's representations.  (*Ibid*.)  But *Aceves* relied in part on the fact that the deputy himself did not make the final call as to whether a conflict existed; rather, the issue was reviewed through superiors in the public defender's office.  (*Id*. at pp. 594–595.)  Moreover, the trial court in *Aceves* expressly stated it did not doubt counsel's representations.  (*Id*. at p. 592.)  And counsel's representations included the opinion that it was unlikely there would be a conflict should new counsel appear on the defendant's behalf.  (*Id*. at p. 589.)

Our case is different.  The court here never stated that it believed Hanlon's description of the seriousness of the threats, and it did express its concern that the same type of conflict had arisen before and might arise again if withdrawal were allowed.  The risk of a "perpetual cycle of eleventh hour motions to withdraw" was one ground upon which *Manfredi*, *supra*, 66 Cal.App.4th at page 1136, distinguished and refused to follow *Aceves, supra,* 51 Cal.App.4th 584.

By the conclusion of the in camera hearing, the court had acquired enough information from Hanlon and from defendant to assess for itself whether an irremediable breakdown had occurred.  In fact, it was evidently defendant's own statements reassuring the court that he meant Hanlon and Rief no harm that swayed the court to believe no grounds for withdrawal existed.  In light of the conflicting reports of the nature of the threats, the trial court was free to resolve the credibility question, and we defer to such

28

findings. (See *Smith*, *supra*, 6 Cal.4th at p. 696 [in *Marsden* hearing, trial court may resolve credibility issues].) The court implicitly concluded, as proved to be true, the threats were the product of a heated disagreement about defense strategy, but did not amount to a risk of actual danger to Hanlon or Rief and did not truly threaten to result in ineffective assistance of counsel. The exchange of heated words does not necessarily reflect an irreconcilable conflict. (*Ibid.*; see also *Miller v. Blacketter* (9th Cir. 2008) 525 F.3d 890, 897.)

We refuse to find, as defendant urges us to do, that the court actually believed Hanlon was in true danger and yet sent him back into the courtroom with defendant without any protection, such that it affected counsel's ability to perform effectively at trial. Defendant acknowledges in his reply brief that shackling defendant would have been an alternative satisfactory resolution to the problem. Yet, Hanlon did not ask to have defendant shackled—and specifically rejected any such remedy—which casts doubt on how seriously he took the threats.[3]

Defendant points to nothing in the record suggesting Hanlon's performance as an advocate at trial actually was affected by the purported threats. From our review of the record, it appears he performed as a conscientious advocate for his client, cross-examining the prosecution's witnesses, putting on defense witnesses, making appropriate objections, and taking care that his client not be prejudiced before the jury (e.g., making sure D.K.'s mother was not allowed to make faces or otherwise react inappropriately while in the courtroom). Hanlon also mentioned talking to his client in jail, so it appears his fear did not prevent him from consulting with defendant during trial. In open court, outside the presence of the jury, Hanlon said he wanted to be in court with defendant at the end of each day when the jury was excused for the evening. These do not appear to be the reactions of a frightened man, nor have we detected anything in counsel's performance that shows he was less than a zealous advocate both before and at trial.

---

[3] Before defendant testified, the court instructed Hanlon that defendant was not to be given any sticks or bats during the examination. Hanlon initially objected to that restriction.

Counsel ultimately did present the heat of passion mitigation argument he thought appropriate, despite defendant's opposition and despite the purported threats, both by requesting jury instructions and by arguing to the jury.

It is evident from the record that the court had great confidence in Hanlon's professionalism and his ability to conduct the best defense possible in these difficult circumstances, despite defendant's purported threats. The record of the trial seems to bear out the judge's faith in this experienced attorney, who appears to have avoided any departure from prevailing norms of effective representation.

The court cited *Lempert v. Superior Court* (2003) 112 Cal.App.4th 1161 (*Lempert*) and *Mandell v. Superior Court* (1977) 67 Cal.App.3d 1 (*Mandell*). While both of those cases reversed the trial court's denial of a motion to withdraw,[4] both held the decision lay in the sound discretion of the trial court, "having in mind whether such withdrawal might work an injustice in the handling of the case," and also whether the withdrawal would "cause undue delay in the proceeding." (*Lempert*, *supra*, at p. 1173; *Mandell*, *supra*, at p. 4.) These are precisely the considerations the trial court relied upon, finding that counsel's withdrawal "would cause a horrible injustice in the handling of the case," and would "require an undue delay."

The gist of defendant's complaint about Hanlon and Rief, as it ultimately emerged, was that he did not want them to present a defense or an argument based on any theory other than pure innocence. Although this was only spelled out for the court clearly after trial, we think the judge would have had a strong inkling that this was behind all of the representation issues based on what she could glean from conversations with defendant,

---

[4] Specifically, those cases dealt with attorneys who sought to withdraw as counsel because their fees were not being paid. (*Lempert, supra*, at pp. 1165–1166; *Mandell*, *supra*, 67 Cal.App.3d at p. 4.) The attorney in *Lempert* told the court "it bordered on involuntary servitude . . . to mandate continued representation," and that he "could not afford to represent defendant through trial without compensation." (*Lempert*, *supra*, at p. 1167.) Because the attorney's livelihood was threatened in those cases, an actual financial conflict of interest existed that likely would have affected counsel's performance at trial.

Hanlon and Horngrad. But sharp disagreements as to strategy do not create an actual conflict, nor do they necessarily signify a complete breakdown in the attorney-client relationship. Similar complaints with counsel have frequently been rejected as a justification for a last minute substitution of counsel. (See *People v. Lau*, *supra*, 177 Cal.App.3d at pp. 478–479 [retained counsel not substituted where defense counsel believed defendant was guilty and should enter a plea]; *Plumlee v. Masto* (9th Cir. 2008) 512 F.3d 1204, 1211 ["Plumlee has cited no Supreme Court case—and we are not aware of any—that stands for the proposition that the Sixth Amendment is violated when a defendant is represented by a lawyer free of actual conflicts of interest, but with whom the defendant refuses to cooperate because of dislike or distrust. Indeed, *Morris v. Slappy* [(1983) 461 U.S. 1] is to the contrary"].) The fact that defendant carried his disagreement with counsel to the point of making colorable, but nonserious threats does not change the outcome.

Fundamentally, "[i]t is well established that an attorney representing a criminal defendant has the power to control the court proceedings." (*People v. Floyd* (1970) 1 Cal.3d 694, 704; accord, *People v. Moore* (1983) 140 Cal.App.3d 508, 513–514 [whether to request a mistrial in counsel's control]; *People v. Williams* (1987) 194 Cal.App.3d 124, 130.) We reject defendant's claim that the foregoing rule applies only to appointed attorneys. Rather, the cases are unconditional in their statement that "[a] criminal accused has only two constitutional rights with respect to his legal representation, and they are mutually exclusive. He may choose to be represented by professional counsel, or he may knowingly and intelligently elect to assume his own representation. [¶] . . . [¶] [¶] [W]hen the accused exercises his constitutional right to representation by professional counsel, it is counsel, not defendant, who is in charge of the case. By choosing professional representation, the accused surrenders all but a handful of 'fundamental' personal rights to *counsel's* complete control of defense strategies and tactics."[5] (*People*

---

[5] A criminal defendant does have limited specific rights to override counsel's decisions. For instance, a defendant undoubtedly has the right to insist on testifying, even if counsel disagrees. (*People v. Robles* (1970) 2 Cal.3d 205, 215; see *Hamilton*,

31

*v. Hamilton* (1989) 48 Cal.3d 1142, 1162–1163 (*Hamilton*); see also *People v. Jones* (1991) 53 Cal.3d 1115, 1139 [retained attorney].)  Where, as here, the untimeliness of the request removed the absolute right to proceed in pro. per., defendant had no right to insist on his choice of legal strategy.  (*Hamilton*, *supra*, at p. 1163.)

This case is similar to *People v. Welch* (1999) 20 Cal.4th 701 (*Welch*), in which "defendant wanted a defense of actual innocence and mistaken identity, whereas counsel pursued the defense that defendant . . . lacked premeditation and deliberation."  (*Id.* at p. 728.)  "A defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense.  (See [*Hamilton*, *supra*, 48 Cal.3d at p. 1162].)  Tactical disagreements between the defendant and his attorney do not by themselves constitute an 'irreconcilable conflict.'  'When a defendant chooses to be represented by professional counsel, that counsel is "captain of the ship" and can make all but a few fundamental decisions for the defendant.' "  (*Id.* at pp. 728–729.)  "A defendant who does not qualify under *Faretta* for self-representation does not have the right to dictate strategy to his counsel.  (See *People v. Hamilton*, *supra*, 48 Cal.3d at p. 1162.)"  (*Welch, supra,* at p. 736.)

Likewise, a "defendant may not force the substitution of counsel by his own conduct that manufactures a conflict."  (*Smith*, *supra*, 6 Cal.4th at p. 696; see also *Miller v. Blacketter, supra,* 525 F.3d at p. 897.)  A "trial court is not required to conclude that an *irreconcilable* conflict exists if the defendant has not made a sustained good faith effort to work out any disagreements with counsel."  (*People v. Myles* (2012) 53 Cal.4th 1181, 1207.)  A defendant's "frequent repetitive attempts to replace" his attorney may reasonably suggest he has "made insufficient efforts to resolve his disagreements" with counsel, making "any breakdown in his relationship with counsel . . . attributable to his own attitude and refusal to cooperate." [6]  (*Clark, supra,* 52 Cal.4th at p. 913.)  The same

---

*supra*, 48 Cal.3d at pp. 1162–1163 [listing a defendant's limited rights to overrule counsel].)

[6] Defendant attempts to distinguish *People v. Clark* (2011) 52 Cal.4th 856 (*Clark*) on the basis that counsel in that case assured the court that she would "fight hard" for the

was true here, as evidenced by defendant's replacement of two previous attorneys, seemingly on similar grounds.[7]

Defendant stresses Hanlon's statement on June 13, 2011 that "he and I no longer communicate. I feel sometimes we're talking at opposite universes or different universes." This statement conflicted with Hanlon's earlier statements that he and defendant had communicated thoroughly, including that Hanlon had read 500 to 1,000 pages of letters from defendant. We trust defendant could have communicated his thoughts about the defense in such abundant correspondence during the nine months Hanlon had represented him. Even if the lines of communication had recently broken down, Hanlon never claimed that his client had been so uncommunicative that Hanlon could not prepare a defense.

This record contains substantial evidence to support the court's implied finding that counsel had no reason to fear physical harm such that his performance at trial would be affected, and that defendant had no legally cognizable reason to disapprove of counsel's performance. Accordingly, no breakdown in the attorney-client relationship had occurred. The court acted within its discretion in denying counsel's motion to withdraw.

## II. Ineffective Assistance of Counsel Before Trial and at Sentencing

Defendant next raises claims of ineffective assistance of trial counsel before trial, at trial, and at sentencing. First, he claims counsel failed to keep him promptly informed of the legal defenses to be raised at trial and this prevented him from hiring new counsel

---

defendant, whereas no such express assurance was given in this case. We find the distinction unpersuasive, as the court repeatedly recognized the excellent representation Hanlon had so far provided. The court impliedly found Hanlon would "fight" for defendant, despite their differences.

[7] Horngrad told the court that he and defendant disagreed about "strategies" and that defendant had threatened him if he failed to carry out defendant's preferred strategy. Defendant told the court he parted ways with Horngrad because Horngrad wanted him to take a 12-year plea bargain. He also complained about a lawyer, inferably Hallinan, who "told the papers that it's a crime of passion, when in reality I [told] him something completely different."

33

to take over the defense who would pursue only the identification defense. Second, he claims he was denied effective assistance of counsel based on Hanlon's "abandonment" of him at sentencing. We also perceive a third claim of ineffective assistance of counsel based on counsel's having argued a heat of passion defense without having presented medical evidence to support it.

## A. *The Law*

A defendant claiming ineffective assistance of counsel must demonstrate both deficient performance and resulting prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 691–692 (*Strickland*).) The burden is on defendant to show, first, that trial counsel failed to act in a manner to be expected of reasonably competent attorneys. (*People v. Lewis* (1990) 50 Cal.3d 262, 288 (*Lewis*); *Strickland*, *supra*, at p. 687.) Where a defendant cannot make such a showing, including cases where the record is not clear, we will affirm. (*Lewis*, *supra*, at p. 288.) On the first prong, a defendant must show that "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." (*Strickland*, *supra*, at p. 688.) Under the second prong, he must show that in the absence of the error it is reasonably probable that a result more favorable to him would have been obtained. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id*. at p. 694.)

We further note that claims of ineffective assistance most often must be raised on a petition for writ of habeas corpus. Raising the issue on appeal is appropriate only if there was no conceivable legitimate basis for counsel's challenged conduct, or if he was asked for an explanation and failed to provide one. (*People v. Mai* (2013) 57 Cal.4th 986, 1009; *Lewis*, *supra*, 50 Cal.3d at p. 288; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.) Here, defendant has chosen to rely on the appellate record which, as we shall discuss, is insufficient to entitle him to relief.

Finally, as discussed above, it is well settled that counsel retains decision-making power with respect to trial strategy. (E.g., *Hamilton*, *supra*, 48 Cal.3d at p. 1163.) We also must avoid second-guessing trial counsel in hindsight and must apply a "highly deferential" review to counsel's performance. (*Strickland*, *supra*, 466 U.S. at p. 689.)

## B. Timing of Defense Counsel's Decision to Argue Heat of Passion

The record here does not clearly disclose when counsel made his decision to argue the lesser included offenses of second degree murder and voluntary manslaughter to the jury, nor does it establish what communication occurred about raising such issues. Defendant claims that Hanlon and Rief "agreed" when they were retained that they would *only* present a defense based on mistaken identity, and would forgo any argument based on heat of passion. We find it unlikely that competent counsel would ever agree to such an inflexible strategy and, in any case, find insufficient support in the record to justify relief on appeal. At the very least, such an argument would have to be raised by a petition for writ of habeas corpus to have even a colorable chance of success.

It is true, as defendant points out, that on January 20, 2011, Hanlon stated to the court that he intended to pursue the theory that "Mr. Mitchell did not commit this crime and that there were other people who did. [¶] That as a defense I will work with him on [it] and I believe him and we will go forward on that. [¶] . . . [¶] [¶] But the issue of heat of passion. So we're not going forward on that, we're going on the defense that Mr. Mitchell did not do this and he will testify." These statements were made in the context of a request for a continuance for further DNA testing on the baseball bat, in hopes that "we will find DNA of unknown persons on it," or perhaps some other individuals' fingerprints. Hanlon also said, "we believe further testing will support his defense that other people did this act," immediately adding that if the court would not allow such testing, "it would be very difficult to go forward, if we will become barred it becomes a more complex defense. [¶] So given the defense we're going to use these tests are mandatory."

These statements do not manifest a final decision—much less a binding commitment—to adhere to a particular trial strategy, and rather reflect that the investigation was ongoing. They also do not show what Hanlon and defendant had discussed about a heat of passion theory. Ultimately, the defense lab's DNA test results apparently provided no support for defendant's third party culpability defense.

Understanding the strength of the evidence against defendant, naturally counsel would consider an alternative defense strategy.

Likewise, at the hearing on May 10, 2011, defendant's statement that "trust issues" had developed was too general to clarify what Hanlon had told defendant about using or not using a heat of passion defense or when that information was conveyed. From defendant's statement the most we can glean is that some significant discussion occurred "two weeks" earlier, presumably after the DNA test results came back from the lab.

Next, defendant points out that on May 25, 2011, counsel requested funds for a psychiatric examination of defendant. The record of that hearing tends to show that counsel was still investigating and deliberating about which defenses to raise at trial. It provides no factual basis for defendant's claim that defense counsel withheld a final decision from him.

On June 21, 2011, defense counsel filed a request for jury instructions, including an instruction on heat of passion voluntary manslaughter (CALCRIM No. 570). The court ultimately did instruct the jury on that theory, as well as on provocation reducing a murder to second degree. This, we conclude, is the first objective sign in the record that Hanlon had decided to argue a heat of passion defense.

What emerges from the foregoing excerpts is the undeniable impression that Hanlon was wrestling through much of the pretrial period with the question of how to best present a defense for this difficult client. On this record, we cannot conclude that Hanlon willfully withheld important information or strategy decisions from defendant. Defendant has not carried his burden of showing that counsel made a decision earlier and withheld it from him until the very last minute, even assuming such conduct would be considered incompetent. Nor has he convinced us that counsel "agreed" in advance not to use a heat of passion argument.

As noted above, the choice of a defense was always Hanlon's. In *Jones*, *supra*, 53 Cal.3d 1115, the defendant was represented by retained counsel who "argued that because of defendant's mental state the jury should find him guilty only of the lesser

36

included offense of voluntary manslaughter. . . . [Counsel made this argument] over the objection of defendant, who insisted on proclaiming his innocence . . . ." (*Id.* at p. 1139.) *Jones* rejected the defendant's assertion that presenting conflicting defenses is categorically incompetent. (*Id.* at pp. 1138–1139; see also *People v. McPeters* (1992) 2 Cal.4th 1148, 1186–1187 [where counsel conceded facts contrary to defendant's testimony, the court ruled: "we cannot say counsel was constitutionally ineffective in his attempt to make the best of a bad situation"].)

Defendant tries to distinguish these authorities on the basis that the defendants in those cases claimed counsel was ineffective for presenting a particular defense at trial, whereas, he claims counsel's ineffectiveness occurred before trial when he failed to communicate his defense strategy to defendant in a timely way. Had he been informed earlier of counsel's intentions, defendant claims he could have simply hired another lawyer who would present his misidentification defense without a heat of passion argument.

Besides taking us outside the record, defendant's argument also rests on the implicit assumption that he could have found another competent attorney who would have actually allowed him to dictate which defense theories would be raised and which would not. Given that Horngrad and Hanlon both refused to be dominated in such a way by this client, it is unlikely he could have found another competent attorney willing to cede to defendant the role of "captain of the ship."

And even assuming Hanlon's conduct fell below professional standards, defendant has not satisfied the prejudice prong of *Strickland*. There is no reason whatsoever to think that a misidentification defense alone would have been more successful.

The evidence showing the falsity of defendant's testimony was overwhelming. The physical evidence showed that defendant was present at the scene and touched the bat, leaving his fingerprint. Defense counsel's argument that the fingerprint could have been the result of a struggle over the bat was probably the best explanation available from a defense standpoint. But two prosecution experts agreed that the blood spatter on defendant's pant legs meant he was within five feet of D.K. when the blows were struck.

37

This not only tended to incriminate defendant, but also belied his claim that he did not see anyone hitting the victim, and in fact did not see the victim at all when he came into her yard. Hanlon's suggestion that he was so "locked in" on his own fight that he did not realize D.K. was being bludgeoned to death less than five feet away—while perhaps the best available argument consistent with defendant's testimony—was a long stretch at best.

Moreover, the jury knew about defendant's previous domestic attacks on D.K., about D.K.'s having cut defendant off from her and the minor because of his drug use, and about the flurry of phone calls made by defendant to D.K. in the days before the attack. From the evidence it may be inferred that defendant began beating the victim on sight, while she still held her car keys in one hand and the minor in the other. Thus, a trial strategy based solely on defendant's testimony was doomed.

While Hanlon's heat of passion argument was also unsuccessful, he did manage to convince the jury that the prosecution had not proved defendant had formed the intent to kidnap the minor before he killed D.K., thus avoiding a life sentence without parole. And although a theory of heat of passion was unlikely to succeed due to lack of proof of provocation, we cannot fault Hanlon for attempting to argue a theory that could potentially have saved defendant years in prison. Defendant has not shown that Hanlon was ineffective before trial either in deciding to argue heat of passion or in failing to communicate his choice of defense strategy to defendant in a timely way.

## C. Presentation of Heat of Passion Argument at Trial

Defendant also argues counsel was ineffective when he presented the lesser included offense theory only in closing argument, without calling experts or other witnesses to support it. Once again, defendant fails to carry his burden on the first prong of *Strickland.* To begin with, defendant fails to enlighten us as to what those experts would have established by their testimony or what other witnesses should have been called.

Hanlon's heat of passion theory was not altogether unsupported by the evidence. The jury had heard testimony about the coincidence of the anniversary of the death of

38

defendant's father and the minor's birth, both falling on the day of the murder.  There was evidence to show how distraught he was over his estrangement from D.K. and his inability to see the minor.  Thus, there was some evidentiary basis for the subjective element of a crime of passion argument, which requires no medical testimony.  (*People v. Steele* (2002) 27 Cal.4th 1230, 1253 (*Steele*); *People v. Mercado* (2013) 216 Cal.App.4th 67, 81–82 (*Mercado*).)  A doctor's evaluation of defendant's mental state or psychological makeup would not have been necessary in presenting this aspect of the theory to the jury.

What was, in fact, missing was evidence on the objective prong of heat of passion analysis—evidence of provocation.  The heat of passion theory is ultimately judged by an objective standard of provocation such as would incite a reasonable person.  (*Steele*, *supra*, 27 Cal.4th at p. 1253; *Mercado*, *supra*, 216 Cal.App.4th at pp. 81–82.)  But defendant was the only person who could have provided such evidence (if it existed), and he insisted on sticking to his story about his confrontation with two other men.

When the court, while hearing defendant's motion for new counsel to present a motion for new trial, ordered Hanlon to explain why he decided to argue mitigation at trial, the following colloquy ensued:  "MR. HANLON:  Because I felt the jury—the evidence was overwhelming, and the only way to save him from life in prison was to make that argument, even though for reasons that I don't think I have to answer . . . your question, I didn't have witnesses to support that.  But I felt that I had to.  I felt Mr. Mitchell's view and the jury's read of his testimony would be correct.  He thought they were behind him and thought he was innocent.  I did not see it that way.  I thought the evidence was overwhelming, as it was from the beginning, and I felt I had to do that to try to save him from life in prison without a chance of parole.  That was my choice. [¶] Mr. Mitchell clearly expressed his desire that I not do it.  I told him—I don't know when that conversation first came up, whether it was before the trial or during the trial, that this was an attorney's choice.  The decision to testify as to what the truth was was up to him, but what to argue was up to me.  And he argued with me about that.  It's clear what he's saying is true, but I made that decision based on what I saw the evidence to be

39

and what was in his best interests. And I tried to make it, you know, it—it was a difficult situation, but, yes, there was a reason why I did it, and that's what it was."

Being appropriately deferential to counsel's tactical decisions, we cannot say Hanlon's reasoning was beyond the realm of competent lawyering. We conceive of counsel's argument on heat of passion not as a contradictory theory, but rather a backup argument, in recognition by counsel that the jurors would likely reject defendant's far-fetched testimony.

Nor can we say Hanlon's strategic decision proved to be prejudicial under the second prong of the *Strickland* test. Hanlon did not altogether abandon defendant's favored theory of defense. In fact, he spent most of his closing argument attempting to support the theory to which defendant had testified. The problem that defendant fails to come to grips with is that his testimony was wholly unbelievable in light of the other evidence, and the evidence of guilt was, in fact, overwhelming. Based on this record, counsel's argument on heat of passion clearly was aimed at making the best of a bad situation and cannot fairly be deemed either incompetent or prejudicial.

## D. Sentencing Hearing

Defendant also argues defense counsel was incompetent at the sentencing hearing because he "abandoned" defendant and basically stood by as a "body," without making any argument on defendant's behalf. At the outset of the August 16, 2011 hearing set for sentencing, the court noted defendant had filed a written request to relieve Hanlon as his attorney for purposes of sentencing and filing a new trial motion.

At a closed hearing, counsel explained there were only two arguments he could make at sentencing. First, he could argue in line with defendant's testimony that defendant was innocent. Counsel rejected that course, saying "[t]o argue to the court at sentencing he didn't do it, given the jury verdict, is meaningless." Counsel argued that the other possibility, to argue that defendant was guilty, but that his crime was mitigated "flies in the face of what he wants, and I—I made that decision once. I'm not going to do it again." "THE COURT: If we were to proceed to sentencing and thinking in that same vein, couldn't you then make the argument that you're talking to me about as far as

concurrent versus consecutive sentences? [¶] MR. HANLON: I'm not prepared to do it again. I'm not prepared to fly in the face of what my client wants. It's his life. I've done my best for him, and I've done my best as an officer of the court. I'm not going to continue in that vein. It's contradictory to what I believe my job is. So, Mr. Mitchell makes this call. He clearly doesn't want me to—he doesn't want me to be his lawyer at sentencing. But if I am, I'm not going to argue against what he believes are the facts. I'm just not prepared to do it again regardless I—with all due respect regarding the order, you can't order me to argue. [¶] THE COURT: Sure. [¶] MR. HANLON: You know, so I would probably submit it and just let the prosecution put on their evidence, and Mr. Mitchell wants to make a statement, he can argue his own view of the evidence. I'm not going to argue at sentencing under these circumstances." Defendant, in fact, wished to replace Hanlon precisely for the reason that he wished his attorney *not* to state any facts contradicting his own profession of complete innocence.

Defendant's preferred argument did not go unexpressed at sentencing. Defendant spoke at length on his own behalf. The court appears to have listened attentively and allowed him to continue speaking even when the prosecutor objected to his calling D.K.'s mother "a drunk." He maintained his absolute innocence, but was also allowed to argue his complaints about counsel, his opinion of D.K.'s mother, and his view of the criminal justice system and the press.

And despite his arguments to the contrary, defendant was not deprived of counsel entirely at the hearing. We do not view Hanlon's presence at sentencing as being nothing more than a "body." Although Hanlon did not make a statement on defendant's behalf at sentencing, he was a legally-trained representative, fully familiar with the facts of the case, who had reviewed the probation report. We are confident, given counsel's otherwise vigorous representation, if the probation report had recommended an unauthorized sentence or had failed to take account of relevant sentencing factors, counsel would have pointed that out. Appellate counsel has specified no sentencing error. Defendant fails to show that Hanlon's assessment of the pros and cons of arguing at sentencing constituted ineffective assistance.

41

Hanlon could reasonably have believed arguing for a lesser sentence based on heat of passion or lack of planning would be pointless, or maybe even an affront to the court, given the jury's rejection of the lesser included offenses. Moreover, defendant perceived such arguments as tantamount to calling him a liar and arguing along those lines could have triggered an outburst from defendant that would have only made things worse for him. Counsel may also have perceived that the trial court would have been unreceptive to arguments based on psychological factors, as it had been when counsel made the section 1368 request. Nor has defendant pointed to any helpful medical evidence that could have been presented.

We apply the usual *Strickland* standard of prejudice and see no reasonable likelihood that counsel's failure to argue at sentencing had a negative impact on the sentence imposed. Indeed, the court had limited sentencing discretion. The sentence for first degree murder is statutorily set at a minimum of 25 years to life. (§ 190.) To that extent, as the court noted, the sentence was "mandatory." Thus, the chief issues for decision by the court were whether to impose the aggravated term of eight years on the kidnapping count, as recommended by probation, and whether to impose the sentences concurrently or consecutively. Given the narrow issues at stake, there was little counsel could have done to influence the court's decision.

The probation report recommended an upper term on the kidnapping count. The identified factors in aggravation overwhelmingly outweighed the circumstances in mitigation, including the violence, viciousness, cruelty and callousness of the beating of D.K. with the minor in close proximity, the use of a deadly weapon, the vulnerability of the victim the minor, the planning and almost "military precision" with which the crime was carried out, and defendant's violation of the trust and confidence of his estranged girlfriend and the minor. With respect to defendant himself, the probation report noted defendant's violence and danger to society with reference not only to the current crimes, but to the fact that his siblings had previously obtained a restraining order against him, not to mention the history of domestic violence against D.K. (Cal. Rules of Court, rule 4.421.) His prior convictions were "just entering the level considered numerous,"

defendant was on probation when the crime was committed, and his performance on probation was, of course, unsatisfactory.

Only one factor in mitigation was identified and that was defendant's history of methamphetamine abuse, which the probation officer noted could have "permanently affected his mental health." (Cal. Rules of Court, rule 4.423.) However, the report concluded "little weight" should be given to this factor, as defendant was not under the influence of drugs at the time of the offense, and claimed that he had not used any controlled substances for a week prior to the instant offense. The court reviewed and considered the probation officer's analysis of this mitigating factor, but concluded that it did not significantly mitigate defendant's crimes.

Although Hanlon had at one point suggested that defendant did have a diagnosed mental health issue (which Hanlon believed was posttraumatic stress disorder, with possible bipolar features), the record sheds no light on whether such a diagnosis would have constituted helpful mitigation evidence. Significantly, defendant does not contend that counsel was ineffective for failing to develop medical evidence for presentation at sentencing or failing to argue existing medical evidence. (See section V, *post.*) In fact, he makes no suggestion about what Hanlon actually should have done at sentencing that he did not do.

The probation report also recommended the sentence on the kidnapping count be imposed consecutively to the 25 to life sentence for the murder because it involved a different victim from the murder. (Cal. Rules of Court, rule 4.425.) The report further recommended that the sentence on the stalking count also be imposed consecutively because it had occurred over a long period of time and had kept D.K. perpetually in fear. It did correctly recommend, however, that the sentences on counts two, four and five be stayed under section 654. The report recommended an aggregate term of 35 years to life.

We see little that counsel could have done to advocate for a more favorable outcome. The reasons for imposing the aggravated terms and consecutive sentences were well articulated in the probation report and would have been difficult to refute. Given defendant's insistence that he was innocent of D.K.'s murder and had actually rescued

43

the minor from being kidnapped by the men in the black and white shirts, remorse certainly could not have been argued to soften the court's view of the offenses. In sum, defendant has failed to meet his burden of showing any ineffectiveness in Hanlon's representation of him at the sentencing hearing, much less resulting prejudice.

### III. Posttrial Motions Relating to New Counsel for Motion for New Trial and for Sentencing

#### A. *New Counsel for a New Trial Motion and Sentencing*

Defendant claims the court erred in denying his motion for new counsel to make a new trial motion, first, by applying the *Marsden* standard, requiring a showing of cause. He contends that because Hanlon was retained, not appointed, that standard was inappropriate. Second, he claims any delay in the proceedings that would have occurred by granting the motion would have been minimally disruptive and would have been outweighed by defendant's right to counsel of his choice, given the irreconcilable breakdown in the relationship between Hanlon and defendant.

In arguing the first point, defendant seizes on the trial court's brief reference to *Marsden* in deciding how to approach defendant's motion. At the outset of the proceedings on August 16, 2011, the trial court asked counsel whether they thought it appropriate to hold a hearing outside of the prosecutor's presence, "sort of in accordance with the *Marsden* case . . . ." The prosecutor agreed he should not be present at the hearing, "[j]ust like a *Marsden*." It is not clear from the remarks whether the court believed the substantive standards of *Marsden* would apply in such a hearing, or whether it simply intended to hold the hearing without the prosecutor. These remarks alone do not clearly establish whether counsel and the court understood this was not strictly a *Marsden* motion, given that Hanlon was retained counsel.

We do note that in opposition to the substitution request the prosecution had filed a written response arguing that a *Marsden*-type hearing was required and that substitution should be allowed only if defendant could show "failure to replace counsel would substantially impair the defendant's right to assistance of counsel based on either inadequate representation or an irreconcilable conflict between counsel and the

44

defendant," citing *Marsden*. Defendant argues this standard was incorrect, citing cases such as *People v. Munoz* (2006) 138 Cal.App.4th 860, 866–867 (*Munoz*) [requesting substitution for a new trial motion] and *People v. Lara*, *supra*, 86 Cal.App.4th at page 155 [motion as trial commenced]. As we have discussed, a request to discharge retained counsel is not governed by the same standard as a motion to substitute appointed counsel. We agree with defendant that holding him to a *Marsden* substantive standard would not have been appropriate in the context of relieving retained counsel, and we believe the prosecutor's response to defendant's posttrial substitution motion was misleading in that respect.

The question is whether the court actually followed the prosecutor's advice on this point, or whether it correctly judged the substitution motion by the standard set forth in *Keshishian*, *supra*, 162 Cal.App.4th 425, denying the motion because it would result in undue delay and disruption of the proceedings. We think the latter is more likely, or at least it cannot be ruled out.

The court held a closed hearing, allowing defendant to state at length the reasons why he believed Hanlon had been ineffective at trial and why new counsel should be appointed to pursue a new trial motion, which would have necessitated putting over the sentencing hearing. Defendant outlined his complaints, including Hanlon's arguing of the heat of passion defense in closing argument, Hanlon's failure to produce doctors or witnesses to support that defense, and Hanlon's purportedly waiting until the last minute to inform defendant he intended to argue the lesser included offenses (thereby preventing defendant from getting another attorney). Defendant also disputed Hanlon's interpretation of the evidence in statements to the jury.[8]

---

[8] Specifically, defendant complained that although he testified he was hit in the back with a baseball bat during his confrontation with the men in the black and white shirts, Hanlon contradicted that testimony in his argument to the jury, saying, "Mr. Mitchell never said he got hit in the back with a bat." Defendant said he could "continue to count the ways" in which Hanlon had contradicted his testimony.

45

After hearing defendant's complaints, the trial court invited Hanlon to respond and he declined. The court asked him whether he could provide "good service" to defendant if sentencing went forward as scheduled that day. We have reviewed in section II.C., the colloquy that followed, with Hanlon telling the court he refused to argue that defendant did not commit the murder, given the jury's verdict, and also refused to argue mitigation because that argument "flies in the face of what [defendant] wants . . . ." Indeed, defendant made it clear he wanted to continue to assert his innocence at sentencing and would not accept Hanlon's advice that the jury's guilty verdicts had foreclosed those arguments. The court, too, tried to explain, "He can't argue to me right now that you didn't do it because the jurors found that you did. [¶] So, it's like we're past that point."

The court denied the motion, expressing its belief that Hanlon's handling of the inconsistent defenses was "the best argument . . . someone could make" on defendant's behalf, "sort of a brilliant argument because it gave jurors two reasons not to find you guilty of first degree murder." The court concluded, "I thought all of the attorneys in the case were excellent . . . your attorney included." The court denied the motion for new counsel and counsel's request to withdraw.

The judge offered to give defendant time to consult with Hanlon before the sentencing continued. Defendant responded, "I'm already suing him for malpractice, Your Honor. I have nothing to discuss with my lawyer." The court then asked whether defendant wanted to make his own statement at sentencing, and defendant responded that he would if the court was "going to take away [his] counsel." The court pointed out, "there's a very good attorney sitting right next to you," to which defendant responded by calling Hanlon "pathetic." The court then said it would deny the motion and would give defendant an opportunity to speak at sentencing, including giving him "a few minutes to think about if you want to say anything or if you want to talk to Mr. Hanlon . . . ."

The Attorney General insists that the trial court did not apply the wrong standard, noting that "the trial court is presumed to have known and applied the correct statutory and case law in the exercise of its official duties." (*People v. Mack* (1986) 178 Cal.App.3d 1026, 1032; Evid. Code § 664.) The record certainly shows the court knew

46

that attempts to replace retained counsel stood on a different footing from attempts to replace appointed counsel when the issue arose at the start of trial, having expressly cited *Keshishian, supra,* 162 Cal.App.4th 425 at an earlier hearing. As discussed in section I.A. above, *Keshishian* held the discharge of retained counsel may be executed at any time, for any reason or no reason, provided the discharge does not result in " 'disruption of the orderly processes of justice.' " (*Keshishian*, *supra*, at p. 428.) The question is whether, as defendant posits, the court failed to recognize the *Keshishian* standard was also correct in the posttrial context.

Given the trial court's demonstrated knowledge of *Keshishian, supra,* 162 Cal.App.4th 425, it may be that the court denied the posttrial motion to substitute because it believed, on balance, that the denial was necessary to avoid disruption of an orderly judicial process. The court did not expressly cite delay and disruption as the reasons for denying the motion, but if the denial was premised on such factors, we could not disturb that ruling as an abuse of discretion.

Here, the motion to substitute counsel was filed just eight days before the sentencing hearing was scheduled and was heard at the beginning of the sentencing hearing. Several witnesses had planned to and did attend the August 16, 2011 sentencing. Appointment of new counsel undoubtedly would have disrupted the proceedings, inconvenienced witnesses, and caused a substantial delay while transcripts were prepared and new counsel familiarized himself or herself with the case. We cannot believe, as defendant tries to convince us, that these factors were not taken into account by the court in ruling on the motion.

Of the cases cited by defendant, *Munoz*, *supra*, 138 Cal.App.4th 860 is the closest to our facts. There, the defendant filed a posttrial motion to relieve retained counsel and have new counsel appointed for a motion for a new trial. The substitution motion was filed 40 days after he was convicted and nine days before the scheduled sentencing. (*Id.* at p. 864.) The court, as here, initially addressed the issue on the date set for sentencing. (*Ibid.*) It made it very clear, however, that it was applying a *Marsden* standard to the request, stating, "We're in a unique situation in that there is one set of rules when you are

47

seeking substitution of counsel prior to a verdict and there is a different set of rules when you are seeking substitution of counsel after a verdict." (*Ibid.*) The trial court informed the defendant that he was not automatically entitled to a new attorney, and that he would have to show a conflict of interest or incompetent representation. (*Ibid.*) The court did not, however, rule on the motion on the date set for sentencing. Instead, it trailed the sentencing hearing for a week to give the defendant a further chance to express his complaints about counsel, which he did in a six-page letter. (*Id.* at pp. 864–865.)

When the hearing resumed a week later, retained counsel expressed the opinion that, because he was retained, the defendant could discharge him "at any time on any quantum of proof . . . ." (*Munoz*, *supra*, 138 Cal.App.4th at p. 865.) The court responded: " 'I believe that what you are suggesting is true prior to trial, or prior to a retrial. . . . [¶] I truly believe that this is a different setting. . . . [W]ere the rule to be that he could discharge you at this point, it would be an automatic situation where there would be a substantial delay in the administration of justice because any new lawyer who came in would only be competent if transcripts were prepared, the entire trial was reviewed, and then a decision was made about that. [¶] I do not believe that that is the state of the law that exists now, so if he had wished to discharge your services prior to trial, I agree with you. But just as if he wanted to discharge your services mid trial, I think it would be a discretionary call on my part and there would have to be a showing. The court believes that the same would occur now.' " (*Ibid.*) It then considered the defendant's request for new counsel under a *Marsden* standard and denied the request.[9]

---

[9] Similar to *Munoz*, *supra,* 138 Cal.App.4th 860, *U.S. v. Rivera-Corona* (9th Cir. 2010) 618 F.3d 976 (*Rivera-Corona*)*,* vacated the trial court's denial of a motion to replace retained counsel with appointed counsel after defendant's guilty plea and before sentencing because the district court used the wrong standard—requiring " 'a complete and utter breakdown' in the attorney-client relationship"—when it denied the defendant's motion. (*Rivera-Corona, supra,* at p. 978.) The defendant told the court he had entered his plea because counsel had demanded $5,000 more to take the case to trial and had threatened to "prosecute [his] family" if he could not pay, which "scared" him into entering a guilty plea. (*Ibid.*) The Ninth Circuit vacated the sentence and remanded the case to the district court, requiring it to "appoint counsel if Rivera-Corona is financially

48

Relying on *People v. Ortiz*, *supra*, 51 Cal.3d at pages 982–987, the Court of Appeal reversed the order denying appointment of new counsel and remanded the cause to allow defendant to discharge his retained attorney. (*Munoz*, *supra*, 138 Cal.App.4th at pp. 866, 871.) The court held that an automatic retrial was not required. Instead, "[o]nce new counsel is appointed, the case shall proceed anew from the point defendant originally sought to discharge his attorney." (*Id.* at p. 871.)

Defendant argues that the court in this case, as in *Munoz*, incorrectly applied a *Marsden* standard in ruling on defendant's motion. Defendant asks for the same remedy here, with new counsel being appointed to consider filing a new trial motion and, if no such motion were to be filed, to appear at resentencing on his behalf.

We find two significant points of distinction that persuade us such a remedy is unnecessary in this case. First, the prospect of delay and disruption in the proceedings in *Munoz* was much less obvious and less severe than in the present case. The crime there was a stabbing during an attempted carjacking that had required only a two-day trial, in which the key witness's testimony had been previously transcribed on a conditional examination. (*Munoz, supra,* 138 Cal.App.4th at p. 868.) Thus, very little time would have been required to allow newly appointed counsel to determine whether to file a motion for a new trial. (*Ibid.*) There was also no mention in *Munoz* that witnesses had appeared to speak at sentencing who would be inconvenienced by the delay. Delay and disruption of the orderly process of justice, therefore, constitutes a much stronger reason for denying the motion in this case than it did in *Munoz*.

*Munoz* itself observed: "Most trials will not be as easily reviewed as this one, so delay and public expense will often be the primary reasons for denying motions to replace counsel [posttrial]. The defendant must always be required to justify this additional expense to the satisfaction of the trial court, and such calls will always be within its broad discretion. Delay and public expense will militate for denial and we do

eligible, and make appropriate factual inquiries into Rivera-Corona's allegations concerning the circumstances underlying his guilty plea if there is a formal motion to set aside the plea." (*Id.* at p. 983.)

49

not envision either a spate of such motions or a plethora of successful ones." (*Munoz*, *supra*, 138 Cal.App.4th at p. 868.)

The trial in the present case and its record were unusually lengthy and complex. It likely would have taken months to secure the transcripts and bring new counsel up to speed so that he or she could draft a new trial motion. If *Munoz* was at the low end of the spectrum of disruption, this case was certainly near the high end. "[D]elay and public expense" justified the court's ruling in this case. (*Munoz*, *supra*, 138 Cal.App.4th at p. 869.) Several witnesses had appeared to speak at defendant's sentencing. The Court of Appeal implicitly found that delay, disruption and public expense did *not* justify a denial of the defendant's motion in *Munoz*, whereas we find the opposite is true here.

The crime victim's family also had rights to a speedy resolution of the case that weighed heavily against a substitution of counsel on the day set for sentencing. Article 1, section 28 of the California Constitution provides in part: "(a) The People of the State of California find and declare all of the following: [¶] . . . [¶] [¶] (6) Victims of crime are entitled to finality in their criminal cases. [¶] . . . [¶] [¶] (b) In order to preserve and protect a victim's rights to justice and due process, a victim shall be entitled to the following rights: [¶] . . . [¶] [¶] (8) To be heard, upon request, at any proceeding, including any . . . sentencing. . . . [¶] (9) To a speedy trial and a prompt and final conclusion of the case and any related post-judgment proceedings."

A second distinction between this case and *Munoz* is that it was very clear that the court applied the wrong standard in *Munoz*, whereas the record in our case is more ambiguous. Arguably, the trial court understood and applied the proper standard, but inquired into defendant's dissatisfaction with Hanlon to determine whether an irreconcilable conflict existed that would justify relieving counsel *regardless* of the delay and disruption it would obviously entail. Read in that light, the court may have simply been assuring itself that it could safely deny the motion on grounds of delay and disruption without violating defendant's Sixth Amendment rights.

Once again, *Maciel*, *supra*, 57 Cal.4th 482 is instructive, and we think dispositive. There, as here, the defendant argued that the court improperly applied a *Marsden*

standard to a motion to discharge retained counsel and appoint counsel in his stead. (*Maciel, supra*, at p. 513.) There, as here, the defendant rested his argument on the fact that the court inquired into the defendant's dissatisfaction with counsel and also used the word "*Marsden*" in referring to the motion. (*Id.* at pp. 513–514.) The Supreme Court rejected his argument that the court had improperly held him to the *Marsden* standard of good cause, a more difficult standard to meet than should have been required under *Ortiz, supra,* 51 Cal.3d 975.

In upholding the trial court's ruling, *Maciel* said: "Contrary to defendant's assertion, the trial court did not deny the motion merely because defendant had failed to demonstrate that counsel was incompetent or had abandoned him or that there was an irreconcilable conflict between defendant and counsel. In evaluating whether a motion to discharge retained counsel is 'timely, i.e., if it will result in "disruption of the orderly processes of justice" ' (*Ortiz*, *supra*, 51 Cal.3d at p. 983), the trial court considers the totality of the circumstances (see *United States v. Gonzalez-Lopez* [(2006)] 548 U.S. [140,] 152; *Verdugo*, *supra*, 50 Cal.4th at p. 311). Although a defendant seeking to discharge his retained attorney is not *required* to demonstrate inadequate representation or an irreconcilable conflict, this does not mean that the trial court cannot properly consider the absence of such circumstances in deciding whether discharging counsel would result in disruption of the orderly processes of justice. Here, defendant raised numerous concerns about retained counsel in his declaration filed in support of the motion to discharge counsel, and the trial court did nothing improper in discussing those concerns with defendant at the hearing." (*Maciel*, *supra*, 57 Cal.4th at pp. 513–514.)

Defendant does not dispute that the court could properly have denied the motion based on delay and disruption alone, but contends the court did not expressly mention those factors in denying the motion and, therefore, must be found to have held him to the higher *Marsden* standard. We cannot accept defendant's argument. Although the judge never said expressly that granting the motion would disrupt the administration of justice, such a consideration was implicit in the circumstances. The motion was being heard on the date set for sentencing, with the probation officer in court, as well as family and

51

friends of D.K. who had appeared to speak at sentencing. We will not entertain the unrealistic supposition that delay and disruption played no role in the judge's ruling. It is defendant's burden to show error on appeal (e.g., *People v. Green* (1979) 95 Cal.App.3d 991, 1001), and we are not convinced that the court improperly applied the *Marsden* standard.

## B. *Hanlon's Motion to Withdraw for Sentencing*

With respect to the court's refusal to allow Hanlon to withdraw for purposes of sentencing, defendant's argument fares no better. We conclude the court was within its discretion in denying the motion, in part because defendant would have been prejudiced at sentencing if he had been forced to appear with no counsel at all. The court was faced with either allowing counsel to withdraw with no substitution, which would have violated his right to counsel at sentencing (*Gardner v. Florida* (1977) 430 U.S. 349, 358; *Mempa v. Rhay* (1967) 389 U.S. 128, 134, 137), or else allowing the withdrawal, but continuing the sentencing hearing, resulting in the disruption of the proceedings that we have already concluded constituted reason enough for denying defendant's substitution motion. The court did not abuse its discretion in denying counsel's request to withdraw. (*People v. Sanchez*, *supra*, 12 Cal.4th at p. 37; *Manfredi*, *supra*, 66 Cal.App.4th 1128, 1133.)

## IV. The Court's Refusal to Order a Section 1368 Evaluation

## A. *Factual Background*

As discussed above, Hanlon unsuccessfully moved to withdraw as counsel on June 13, 2011. Only upon the denial of the motion to withdraw did he for the first time raise a doubt as to defendant's competence under section 1368. And only the next day did Hanlon produce his declaration claiming he had harbored longstanding doubts as to defendant's competence. That declaration of course flatly contradicted Hanlon's statement to the court just a few days earlier that he had no doubts about defendant's competence in the context of defendant's *Faretta* motion.

Hanlon argued that his declaration of a doubt as to the defendant's competency was based on his inability to communicate with defendant "in any meaningful way," as well as defendant's "inability to communicate" with him. Hanlon told the court, "there

are things that are approaching delusional comments . . . ." The court noted it had spoken at length to defendant that day at the closed hearing, as well as the preceding Friday, and found him fully able to communicate. The court found defendant "to be competent," and to have "the ability to communicate with counsel if he chooses to do so." Hanlon said, based on his greater familiarity with defendant, he believed "things are going on in [defendant's] head that are not real." He felt he had watched a "breakdown occur" with "delusional things" becoming more and more common.

The court noted that in nine months Hanlon had been representing defendant he had never previously stated a doubt about defendant's competence. In fact, the previous week, when defendant requested to represent himself, Hanlon "made a record indicating [he] felt he was competent to do so." The court noted Hanlon expressed a doubt about defendant's competency only after his motion to withdraw had been denied, and "the timing is suspicious." The court concluded, "[t]here's not a doubt in my mind as it relates to the competency of the defendant. So I'm not going to suspend criminal proceedings."

The following day Hanlon filed a declaration under seal providing more details to support his doubt about defendant's competency, in which he stated that he had sought the advice of two forensic psychiatrists, but neither would express an opinion without interviewing defendant, who refused to be interviewed. Hanlon claimed he had not pushed the issue earlier so as to avoid causing a "total and irreversible breakdown of the attorney-client relationship." When he told the court on Friday, June 10, 2011, that defendant was competent, he did so despite "grave doubts as to his competency to communicate in a meaningful way with me." Hanlon conceded he had made a "mistake" in vouching for defendant's competency, and that "my judgment may have been effected [*sic*] by the recent threats of violence he had made against me, the breakdown of our attorney-client relationship, and my knowledge that I felt I could no longer continue in my representation of him." In recent weeks, defendant had become resistant to talking about the facts of the case, becoming agitated and angry when Hanlon pressed him on facts of his defense.

53

Hanlon declared that prosecution and defense interviews with family members and others showed defendant had a long history of psychological problems, learning disabilities, and bizarre behavior, and that his delusional thinking had existed since childhood. Hanlon said a psychiatrist retained by Hallinan had diagnosed defendant with "a recognizable mental illness that included delusional ideation."

The declaration listed several statements made by defendant that Hanlon believed were delusional because, after investigation, he concluded they were untrue. These included defendant's claim he had been visited in jail by famous people, had been part of a secret military force, had had sexual relations with well-known women, had been a bodyguard for a famous musician and had been shot while protecting him. It is difficult to tell from Hanlon's declaration whether all of these statements had been investigated and found to be untrue. We note that because defendant was a member of a well-known family in the world of adult entertainment, his claims of consorting with well-known people cannot be rejected as delusional quite as readily as they might be in some other cases.[10]

After reviewing Hanlon's declaration, the court noted in particular that after defendant made his *Faretta* motion and had been given his attorneys' files over the weekend, he came into court and made a "very rational," "very reasonable," "very intelligent" and "very coherent" presentation to the court about the materials he had reviewed and his reasons for and estimate of needing more time to prepare. He was also able to explain at the in camera hearing on Hanlon's motion to withdraw both his own emotional state and his communications with his attorneys, as well as describing his stresses in jail and his defense strategy in a manner the court described as "coherent and reasonable." The court stressed that it found defendant's discussion during the hearing to

---

[10] Defendant is the son of one of the Mitchell Brothers, rather well-known producers of pornography. Defendant himself had worked at the O'Farrell Theater in San Francisco, a family-owned business, which he described as a "strip club." It is, therefore, not inconceivable that defendant would have known "famous" people or slept with "well-known" women.

be "[v]ery reasonable, very intelligent, and very thoughtful." The court acknowledged that defendant and his attorneys "have some disagreements," "[b]ut I . . . don't think that that makes Mr. Mitchell incompetent." The court again noted that it considered the timing of the motion "a little suspect," and felt "very strongly" there was "not substantial evidence . . . that would suggest that Mr. Mitchell is incompetent." It, therefore, denied the renewed motion. Under settled law, that ruling was within the court's discretion.

## B. The Law

"A defendant is presumed competent unless it is proved otherwise by a preponderance of the evidence. . . . [¶] If a defendant presents substantial evidence of his lack of competence and is unable to assist counsel in the conduct of a defense in a rational manner during the legal proceedings, the court must stop the proceedings and order a hearing on the competence issue. [(*Pate* [*v. Robinson* (1966) 383] U.S. [375,] 384–386.)] [Citation.] In this context, substantial evidence means evidence that raises a reasonable doubt about the defendant's ability to stand trial. [Citation.] The substantiality of the evidence is determined when the competence issue arises at any point in the proceedings. [Citation.] The court's decision whether to grant a competency hearing is reviewed under an abuse of discretion standard." (*People v. Ramos* (2004) 34 Cal.4th 494, 507 (*Ramos*).)

"Substantial evidence of incompetence may arise from separate sources, including the defendant's own behavior. For example, if a psychiatrist or psychologist 'who has had sufficient opportunity to examine the accused, states under oath with particularity that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel, the substantial-evidence test is satisfied.' [Citation.] If a defendant presents merely 'a litany of facts, none of which actually related to his competence at the time of sentencing to understand the nature of that proceeding or to rationally assist his counsel at that proceeding,' the evidence will be inadequate to support holding a competency hearing. [Citation.] In other words, a defendant must exhibit more than bizarre, paranoid behavior, strange

55

words, or a preexisting psychiatric condition that has little bearing on the question of whether the defendant can assist his defense counsel." (*Ramos*, *supra*, 34 Cal.4th at pp. 507–508.)

"When the evidence casting doubt on an accused's present competence is less than substantial, the following rules govern the application of section 1368. It is within the discretion of the trial judge whether to order a competence hearing. When the trial court's declaration of a doubt is discretionary, it is clear that 'more is required to raise a doubt than mere bizarre actions . . . or bizarre statements . . . or statements of defense counsel that defendant is incapable of cooperating in his defense . . . or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense . . . ." (*Welch*, *supra*, 20 Cal.4th at p. 742.)

## C. Analysis

The reliability of Hanlon's assertion of a doubt as to defendant's competency was severely undercut by words from Hanlon's own mouth just days earlier. In order to credibly assert a doubt about his client's competence, Hanlon had to account for the fact that on the preceding Friday, he told the court he had no doubt whatsoever as to defendant's competency, and by June 14, 2011, he claimed to have had a doubt of long standing.

Despite Hanlon's efforts to distance himself from his earlier comments, the court was not obligated to accept his explanations and could, based on its own observation of defendant, place more credence in counsel's initial expression of confidence in defendant's competence. Accordingly, the court, in its reasoned discretion, was justified in finding Hanlon's declaration was not substantial evidence of defendant's incompetence. *Ramos* made clear that a defendant's demeanor during court appearances could be used in determining competency. "Although a court may not rely *solely* on its observations of a defendant in the courtroom *if there is substantial evidence of incompetence*, the court's observations and objective opinion do become important when no substantial evidence exists that the defendant is less than competent to plead guilty or

stand trial. [Citation.] When a defendant has not presented substantial evidence to indicate he was incompetent, and the court's declaration of a doubt is therefore discretionary, its brief reference to the defendant's demeanor is not error." (*Ramos, supra,* 34 Cal.4th at p. 509, italics added; see also *People v. Rogers* (2006) 39 Cal.4th 826, 849–850 ["psychiatric testimony . . . with little reference to defendant's ability to assist in his own defense" not sufficient]; *People v. Blair* (2005) 36 Cal.4th 686, 714 [preexisting mental condition not sufficient].)

Thus, Hanlon's assertion that defendant had a "long history . . . of psychological problems . . . and bizarre behavior" did not amount to substantial evidence that he was incompetent to go to trial. Defendant's purported past mental problems were remote in time, did not come in the form of expert opinions, and were insufficiently connected to defendant's current health status and ability to assist in his defense at trial.

Likewise, Hanlon's litany of facts purportedly leading to a conclusion of incompetency (such as delusional statements) did not relate those facts to an inability to aid in his own defense. Although defendant might have been uncooperative in executing Hanlon's strategy, there is no reason to believe his behavior was due to mental problems rather than sheer stubborn insistence on his innocence. The court was within its discretion in declining to convene competency proceedings, bolstered by its lengthy and detailed colloquies with defendant before trial.

"[A]n uncooperative attitude is not, in and of itself, substantial evidence of incompetence." (*People v. Mai*, *supra*, 57 Cal.4th at p. 1034.) And "although a defense counsel's opinion that his client is incompetent is entitled to some weight, such an opinion alone does not compel the trial court to hold a competency hearing unless the court itself has expressed a doubt as to the defendant's competence. [Citation.] Here, the trial court entertained no such doubt. [¶] . . . [¶] [¶] Defendant further faults the trial court for concluding defendant's unwillingness to cooperate with his counsel did not equate with an inability to assist counsel. But we have recognized a similar distinction. [Citation.] If there is testimony from a qualified expert that, because of a mental disorder, a defendant truly lacks the ability to cooperate with counsel, a competency

hearing is required. [Citation.] Here, however, there was no substantial evidence that defendant's lack of cooperation stemmed from *inability* rather than *unwillingness*, and the trial court's comments suggest that it found defendant's problem to be of the latter type rather than the former. In these circumstances, no competency hearing was required." (*People v. Lewis* (2008) 43 Cal.4th 415, 525–526, italics added; see also *Welch*, *supra*, 20 Cal.4th at p. 742 [defendant's disagreement with counsel about "which defense to employ," even when accompanied by "paranoid distrust" of the legal system and his lawyer, did not require competency hearing].) The court in our case came expressly to the same conclusion. The trial court acted within its discretion in determining Hanlon's evidence of defendant's incompetence was insubstantial and declining to order a hearing under section 1368.

### V. Refusal to Grant Counsel's Request for Funds for Psychological Expert

#### A. *Factual Background*

On May 25, 2011, during jury selection, defense counsel requested an ex parte hearing with the judge without his client's presence, during which he reviewed with the court the history of his representation of defendant. Counsel reported that defendant flatly refused counsel's repeated advice that they should pursue a psychological defense. Counsel said there were past psychological reports, and reports from family and friends, that defendant may have had some past psychological issues. He pointed out the bizarre coincidence that defendant's father had killed his brother (defendant's uncle) on July 12, 1991. Defendant's father had died on July 12, 2007. Defendant's minor child was born on July 12, and the murder of D.K. occurred on July 12, 2009. Hanlon thought this pointed to a "perfect storm" of psychological stressors that could have triggered the crime.

Hanlon believed he needed to investigate such a defense, but because defendant would not cooperate with an examination, the psychological expert could only review defendant's medical records and watch him testify. If "that doctor came to the conclusion that he did suffer from a disease that affected either his ability to testify, or in

fact, what happened," the defense "would call that person." Counsel estimated that such an expert would charge $300 to $500 per hour, and would cost $20,000 to $30,000.

The court carefully considered counsel's request, noting "the Court has already provided funds for Mr. Mitchell's defense, and for the defense he wants." Counsel conceded that the trial court had been "generous" in funding the defense investigation. As for a psychiatrist who would merely watch defendant testify, the court said: "I don't even know if that would necessarily be admissible evidence, which is something I think I need to consider, especially since it's a large amount of money that is being requested." Of course, the court pointed out that the request was on the eve of trial, which would cause a problem of notice to the prosecution. But the court said, "the most important thing" was that defendant's due process rights be guarded. The court concluded it would not be prudent to give counsel "such an exorbitant amount of money for a conflicting defense that might not come into play in any event."

However, the court did not entirely deny counsel's request. Instead, if counsel thought "a psychiatrist or psychologist could review any prior medical records and enter an opinion that you're wanting, with a dollar figure of [$2,000]"; Hanlon was encouraged to "look into that" and to "ask me again" if the expert's initial work seemed to call for further investigation. "If you don't think that's going to be enough money for you to look into this alternative defense, then I decline to provide additional funds." Defendant points to no further discussion of the topic, nor are we aware of any.

## B. The Law

"An indigent defendant has a statutory and constitutional right to ancillary services reasonably necessary to prepare a defense. (§ 987.9, subd. (a); [*Corenevsky v. Superior Court* (1984) 36 Cal.3d 307, 319–320].) The defendant has the burden of demonstrating the need for the requested services. [Citation.] The trial court should view a motion for assistance with considerable liberality, but it should also order the requested services only upon a showing they are reasonably necessary. . . . On appeal, a trial court's order on a motion for ancillary services is reviewed for abuse of discretion." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1085; see also *People v. Gonzales and Soliz* (2011) 52 Cal.4th

59

254, 286 [where "defendant failed to carry his burden to show that additional funding was reasonably necessary, . . . the trial court properly exercised its discretion to deny the motion"]; *People v. Beardslee* (1991) 53 Cal.3d 68, 100 [defendant "had the burden of showing that the investigative services were reasonably necessary by reference to the general lines of inquiry he wished to pursue, being as specific as possible. [Citation.] Although a motion for assistance should be viewed with considerable liberality . . . , on appeal the trial court's order is presumed correct. Error must be affirmatively shown"].)

## C. Analysis

We think it is significant that the trial court did not deny defendant's request outright, but rather conditionally granted counsel a disbursement of $2,000 to look into the psychological defense. The trial court acted reasonably and within its discretion in authorizing a smaller amount for a preliminary investigation. Counsel's preferred psychiatrist would have charged $300 to $500 per hour, and he said he needed $20,000 to $30,000 in total. Mathematically, this suggests he was estimating 40 to 100 hours of expert psychiatric work, which inferably included the time the psychiatrist would have spent in court observing defendant's testimony and demeanor. Hanlon made no record below why, perhaps at a more modest hourly rate, he could not have secured the services of a competent psychologist or psychiatrist to conduct a preliminary review of defendant's medical records in far less time and for far less money.[11]

In fact, there is no indication in the record that defense counsel actually requested the $2,000 offered by the court. Defendant, therefore, arguably forfeited the claim he now raises. (Cf. *People v. Ervin* (2000) 22 Cal.4th 48, 68 [where circumstances changed, failure to renew severance motion forfeited issue on appeal]; *People v. Davenport* (1995) 11 Cal.4th 1171, 1195 [same, motion challenging jury composition].)

Finally, as to prejudice, defendant makes no reasonable argument that his trial was rendered unfair or that he otherwise suffered prejudice because of the failure of the trial

---

[11] An indigent defendant does not have a constitutional right to choose a psychiatrist "of his personal liking," but rather, only has a right to a "competent psychiatrist." (*Ake v. Oklahoma* (1985) 470 U.S. 68, 83.)

court to offer more than the preliminary $2,000. (See *People v. Guerra*, *supra*, 37 Cal.4th at p. 1086.) Defendant has failed to identify any mental defect or disease that he was suffering from, to explain the effect any such psychological problem had on his mental state at the time of the murder, or to make any showing or even any argument as to what a psychologist or psychiatrist would have reported if funds had been granted. Given defendant's resistance, it was not reasonably likely that counsel would have put on any actual evidence of a psychological defense. And though defendant seems to believe medical testimony was necessary to support a heat of passion defense, that clearly is not the case. As discussed above, psychological evidence could have contributed to the subjective element of heat of passion (for which there was already evidence), but would have been irrelevant to the objective element. (*Steele*, *supra*, 27 Cal.4th at p. 1253; *Mercado*, *supra*, 216 Cal.App.4th at pp. 81–82.) Moreover, as discussed above, the evidence of guilt was overwhelming. Consequently, defendant has not shown that the trial court's ruling on his request for $20,000 to $30,000 had any negative effect on his defense.

## VI. Sufficiency of Evidence of Child Endangerment

Defendant next challenges the sufficiency of the evidence for the jury's verdict on count five, felony child endangerment under section 273a, subdivision (a). The standard of review is the familiar substantial evidence standard. "Substantial evidence is 'evidence which is reasonable, credible, and of solid value.' " (*People v. Morales* (2008) 168 Cal.App.4th 1075, 1083–1084 (*Morales*).) The question is whether any reasonable trier of fact could have found defendant guilty beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

Defendant argues that the evidence was insufficient to prove the child endangerment charge because he took good care of the minor, and that he did not expose her to conditions likely to cause her great bodily harm. Defendant argues that he first assumed custody of the minor when he grabbed her from the man in the black T-shirt. He then carried her to his car. He cites Nick's testimony that he took "good care of the

[minor]" when he placed the minor in his car. He claims from that point forward there was no evidence that he placed the minor in danger.

But in making this argument, defendant analogizes to kidnapping cases and other cases in which the defendant had no clear legal duty to care for the child. "Section 273a does not require that a defendant be related to a child. . . . '[T]he relevant question in a situation involving an individual *who does not otherwise have a duty imposed by law* or formalized agreement to care for a child (*as in the case of parents* or babysitters), is whether the individual in question can be found to have undertaken the attendant responsibilities at all.' " (*Morales*, *supra*, 168 Cal.App.4th at pp. 1083–1084, italics added, fn. omitted [defendant kidnapper assumed caregiving responsibilities when he kidnapped victim and endangered her by taking her as a passenger in his speeding car]; see also *People v. Perez* (2008) 164 Cal.App.4th 1462, 1471 [defendant properly convicted under § 273a for having heroin and heroin-filled syringe in home he shared with his sister, whose granddaughter sometimes stayed there while defendant was the only awake adult in the home]; *People v. Malfavon* (2002) 102 Cal.App.4th 727, 731, 734, 737 [defendant shook to death his girlfriend's seven-month-old baby while left to watch her briefly]; *People v. Culuko* (2000) 78 Cal.App.4th 307, 313, 335 [man who had lived with baby's mother for two months properly convicted, along with mother, under § 273a, where baby died from being punched in the stomach and showed signs of past abuse]; *People v. Cochran* (1998) 62 Cal.App.4th 826, 833 [defendant's conviction sustained where he allowed child to live in his house and acted as "surrogate father"].) Before he ever took the minor from her mother, defendant had a preexisting fundamental legal duty of care as the minor's father.[12]  Hence, we find his cases inapposite.

---

[12] "[P]arents have a duty 'to exercise reasonable care, supervision, protection, and control over their minor child[ren].' (§ 272, subd. (a)(2).)" (*People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 746.)  " 'It is the right and duty of parents under the law of nature as well as the common law and the statutes of many states to protect their children, to care for them in sickness and in health, and to do whatever may be necessary for their care, maintenance, and preservation.' " (*Lipscomb By And Through DeFehr v. Simmons* (9th Cir. 1992) 962 F.2d 1374, 1386, fn. 2; *Williams v. Garcetti* (1993) 5 Cal.4th 561,

As the prosecutor argued, it could be inferred from the evidence that D.K. held the minor in her arms when the attack began. Thus, the minor was endangered in various ways: the minor could have been dropped by D.K., D.K. could have fallen on top of the minor, and of course, the minor could have been hit by the baseball bat. That the minor was spattered with D.K.'s blood gave rise to a legitimate inference that the minor had been close to D.K. during the attack and, therefore, in danger. In fact, the prosecutor's theory was that the minor was actually trapped under D.K.'s body as defendant beat D.K. to death.[13]

Moreover, there can be no doubt that once defendant took the minor away in his car he had assumed care and custody of her. Rather than taking appropriate precaution, defendant put her in the front seat of his car and drove at highway speeds with the minor protected, at most, with an adult seat belt. A patrol officer from the Citrus Heights Police Department testified that a front seat belt is not a safe method to restrain a child of the minor's size and would not "provide [the minor] any safety if there was a collision." By leaving the minor alone in the car at night defendant added another layer of danger. Based on all of these facts, the jury had ample evidence on which to base its verdict.

### VII. Restraining Order Under Section 646.9

Finally, defendant argues the trial court exceeded its authority at sentencing when it issued an order under the stalking statute (§ 646.9) restraining defendant from having contact with the minor or D.K.'s mother for 10 years because they were not the named victims of the stalking offense. The operative language of section 649.6, subdivision (k)(1), is as follows: "The sentencing court also shall consider issuing an order

---

570 [parents' legal responsibilities for care and protection of their children are well established and defined]; *People v. Burden* (1977) 72 Cal.App.3d 603, 606, 615–616, 618–621 [death of baby by starvation was murder because defendant father had common law duty to care for him].)

[13] D.K. had been face down during the beating, but she was on her side when the police arrived. Nick did not see or hear the minor during the beating. The prosecutor theorized that the minor was lying under D.K. when she was murdered and that defendant turned her on her side as he snatched the minor from her arms.

restraining the defendant from any contact with the victim, that may be valid for up to 10 years, as determined by the court. It is the intent of the Legislature that the length of any restraining order be based upon the seriousness of the facts before the court, the probability of future violations, and the safety of the victim and his or her immediate family."

We are faced with two conflicting opinions construing this language and the very similar language of section 136.2, subdivision (i)(1).[14] *People v. Clayburg* (2012) 211 Cal.App.4th 86, 88 (*Clayburg*) expressly authorized a restraining order to protect immediate family members who "suffer[] emotional harm" under section 646.9, while *People v. Delarosarauda* (2014) 227 Cal.App.4th 205, 211–213 (*Delarosarauda*) disagreed with the *Clayburg* majority and held that family members are not "victims" under the similarly worded section 136.2.

The majority opinion in *Clayburg, supra*, 211 Cal.App.4th 86, held the reference to "immediate family" in the second sentence of the statute expands the class of "victims" on whose behalf a protective order may be issued. (*Id.* at pp. 90–92.) A dissenting opinion by Justice Perren interpreted section 646.9, subdivision (k)(1) as authorizing a protective order only for the named victim of the stalking offense, and expressed the view that the reference to "immediate family" in the second sentence above was intended only to make the safety of such individuals a factor to be considered in setting the duration of the protective order. (*Clayburg, supra*, at p. 95.) *Delarosarauda* agreed with the construction advocated by Justice Perren and interpreted section 136.2, subdivision (i)(1) as authorizing protective orders only on behalf of named victims of domestic violence.

---

[14] Section 136.2, subdivision (i)(1) provides in relevant part: "[T]he court, at the time of sentencing, shall consider issuing an order restraining the defendant from any contact with the victim. The order may be valid for up to 10 years, as determined by the court. . . . It is the intent of the Legislature in enacting this subdivision that the duration of any restraining order issued by the court be based upon the seriousness of the facts before the court, the probability of future violations, and the safety of the victim and his or her immediate family."

As a matter of statutory interpretation, we agree with the reasoning of *Delarosarauda* and the *Clayburg* dissent. We do not believe the second sentence of section 646.9, subdivision (k)(1) modifies the definition of "victim" in the first sentence. We therefore reverse the protective order issued under section 646.9.

## DISPOSITION

The order restraining defendant from having contact with the minor and D.K.'s mother is reversed. In all other respects the judgment is affirmed.

_____
Becton, J.*

We concur:

_____
Margulies, Acting P.J.

_____
Dondero, J.

* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.